UNITED STATES of America,

v.

Alan QUINONES, et al., Defendants.

No. S3 00 CR. 761(JSR).

United States District Court,
S.D. New York.

April 25, 2002.

Lee Ginsberg, Freeman Nooter & Ginsberg, New York, NY, Kevin McNally, Frankfort, KY, for Alan Quinones.

David B. Anders, Assist. U.S. Atty., Mary Jo White, U.S. Atty., New York, NY, for U.S.

## OPINION AND ORDER

RAKOFF, District Judge.

The Federal Death Penalty Act, 18 U.S.C. §§ 3591–3598, serves deterrent and retributive functions, or so Congress could reasonably have concluded when it passed the Act in 1994. But despite the important goals, and undoubted popularity, of this federal act and similar state statutes, legislatures and courts have always been queasy about the possibility that an innocent person, mistakenly convicted and sentenced to death under such a statute, might be executed before he could vindicate his innocence—an event difficult to square with basic constitutional guarantees, let alone simple justice. As Justice O'Connor, concurring along with Justice Kennedy in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), stated: "I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitu-

tion. Regardless of the verbal formula employed—'contrary to contemporary standards of decency,' 'shocking to the conscience,' or offensive to a 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental'—the execution of a legally and factually innocent person would be a constitutionally intolerable event." *Id.* at 870 (citations omitted).

To the majority in *Herrera*, however, as to most judges and legislators at the time (1993), the possibility that an innocent person might be executed pursuant to a death penalty statute seemed remote. Thus, Chief Justice Rehnquist, writing for the Court in *Herrera*, discounted as potentially unreliable a study that had concluded that 23 innocent persons were executed in the United States between 1900 and 1987. *See Herrera*, 113 S.Ct. at 868, n. 15. While recognizing that no system of justice is infallible, the majority in *Herrera* implicitly assumed that the high standard of proof and numerous procedural protections required in criminal cases, coupled with judicial review, post-conviction remedies, and, when all else failed, the possibility of executive clemency, rendered it highly unlikely that an executed person would subsequently be discovered to be innocent.

That assumption no longer seems tenable. In just the few years since *Herrera*, evidence has emerged that clearly indicates that, despite all the aforementioned safeguards, innocent people—mostly of color—are convicted of capital crimes they never committed, their convictions affirmed, and their collateral remedies denied, with a frequency far greater than previously supposed.

Most striking are the results obtained through the use of post-conviction testing with deoxyribonucleic acid ("DNA"). Although DNA testing is of remarkably high reliability,[1] its value as a forensic tool in criminal investigations was not demonstrated until 1985[2] and its use in re-evaluating prior convictions was only beginning at the time *Herrera* was decided in 1993.[3] Yet in just the few years since then, DNA testing has established the factual innocence of no fewer than 12 inmates on death row, some of whom came within days of being executed and all of whom have now been released.[4] This alone strongly suggests that more than a few people have been executed in recent decades whose innocence, otherwise unapparent to either the executive or judicial branches, would have been conclusively established by DNA testing if it had been available in their cases.

---

**1.** *See, e.g.,* National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, *The Future of Forensic DNA Testing* (2000) at 6.

**2.** *See id.* at 1, 13.

**3.** *See Development in the Law–Confronting the New Challenges of Scientific Evidence,* 108 Harv. L.Rev. 1557, 1573–78 (1995); *see also* the proposed bipartisan Innocence Protection Act of 2001, S.486, 107th Congress, § 101(a)(3)(2001); H.R. 912, 107th Congress, § 101(a)(3)(2001)(Findings).

**4.** Defendants' statistics and summaries of such releases, derived from data kept and

continuously updated by the Death Penalty Information Center at its website, *http://www.deathpenaltyinfo.org/innoccases,* have not been disputed by the Government on this motion. *See also* Ex. A to Defendants' letter brief dated April 11, 2002, Press Release from the Death Penalty Information Center dated April 9, 2002. *Cf.* S.486, at § 101(a)(5)(more than 80 defendants, including 10 who had been sentenced to death, exonerated by DNA testing between 1994 and 2001). *See generally* National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial* (1996).

The problem, however, goes well beyond the issue of the availability of DNA testing. Indeed, the success of DNA testing in uncovering the innocence of death row defendants has itself helped spark reinvestigation of numerous other capital cases as to which DNA testing is unavailable or irrelevant but as to which other techniques can be applied. Partly as a result, in just the past decade, at least 20 additional defendants who had been duly convicted of capital crimes and were facing execution have been exonerated and released.[5] Again, the inference is unmistakable that numerous innocent people have been executed whose innocence might otherwise have been similarly established, whether by newly-developed scientific techniques, newly-discovered evidence, or simply renewed attention to their cases.

Moreover, even the frequency of these recent exonerations resulting from DNA testing and from fresh attention to neglected cases hardly captures either the magnitude of the problem or how little it was recognized until recently. It was not until the year 2000, for example, that Professor James S. Liebman and his colleagues at Columbia Law School released the results of the first comprehensive study ever undertaken of modern American capital appeals (4,578 appeals between 1973 and 1995). That study, though based only on those errors judicially identified on appeal, concluded that "the overall rate of prejudicial error in the American capital punishment system" is a remarkable 68%. James S. Liebman, et al., *A Broken System: Error Rates in Capital Cases* (2000) at ii. No system so "persistently and systematically fraught with error," *id.*, can warrant the kind of reliance that would justify removing the possibility of future exoneration by imposing death.

Just as there is typically no statute of limitations for first-degree murder—for the obvious reason that it would be intolerable to let a cold-blooded murderer escape justice through the mere passage of time—so too one may ask whether it is tolerable to put a time limit on when someone wrongly convicted of murder must prove his innocence or face extinction. In constitutional terms, the issue is whether—now that we know the fallibility of our system in capital cases—capital punishment is unconstitutional because it creates an undue risk that a meaningful number of innocent persons, by being put to death before the emergence of the techniques or evidence that will establish their innocence, are thereby effectively deprived of the opportunity to prove their innocence—and thus deprived of the process that is reasonably due them in these circumstances under the Fifth Amendment.[6]

5. Defendants claim that the figures are even higher, but a review of the underlying data on the website of the Death Penalty Information Center, *supra,* shows that the defendants' figures include cases in which the basis of the exoneration is not clearly discernible. On any fair analysis of the website data, however, at least 20 of the 51 death-sentenced defendants who have been released from prison since 1991 were released on grounds indicating factual innocence derived from evidence other than DNA testing.

6. "No person shall ... be deprived of life, liberty, or property without due process of law...." While this language—drafted when capital punishment for such offenses as burglary, arson, counterfeiting and theft, was common, *see* Stuart Banner, *The Death Penalty: An American History* (2002) at 5—clearly implies that some capital punishment is compatible with due process, due process is, virtually by definition, an evolving concept that takes account of current conditions and new discoveries, as well as heightened moral awareness. In *Herrera,* the concurring and dissenting justices (a majority of the Court), in describing the execution of the innocent as a constitutionally intolerable event, used terms like "shock the conscience," suggesting that they view it as a denial of substantive due process.

■ In the instant case, the Government has announced its unalterable intention to seek the death penalty with respect to defendants Alan Quinones and Diego Rodriguez, the only two of the eight defendants originally named in this narcotics/murder case who have not pled guilty to the underlying charges. Trial of those charges, and, if the defendants are convicted, of the Government's request for imposition of the death penalty, is scheduled to begin September 2, 2002. Meanwhile, the two death–eligible defendants have moved to have the death penalty aspects dismissed from the case, on the ground, *inter alia*, that the federal death penalty statute is, for the aforementioned reasons, unconstitutional.[7] The Government does not contest the defendants' standing to make this motion at this time, and, indeed, it could not, for as presumptively innocent persons whose death the Government has committed to seek immediately upon their conviction of the capital offenses here alleged, the defendants are already directly affected by the death-penalty potential in every aspect of their defense.

■ On the merits, the Government concedes that "research has not uncovered a case addressing the precise point" here raised, *i.e.*, "whether the death penalty violate[s] due process, and is therefore unconstitutional, because, by its very nature, it cuts off a defendant's ability to establish his actual innocence." Govt. letter brief dated March 29, 2002 at 1.[8] The Government asserts, however, that the thrust of defendants' argument is contrary to the positions taken by the Supreme Court in *Herrera, supra*, where the Court affirmed the denial of petitioner's second petition for habeas relief in which he alleged that his pending execution in the face of new evidence of his alleged innocence would violate the Eighth and Fourteenth Amendments.

This Court is not persuaded that *Herrera* provides the guidance necessary to resolve the instant issue. Unlike the presumptively innocent federal defendants bringing the present motion, *Herrera* involved a state-convicted defendant seeking a second habeas review whose proof of "actual innocence" was tenuous on its face—a factor that weighed heavily in the view of two of the justices (O'Connor and Kennedy) who made up the five-justice majority. *See Herrera*, 506 U.S. at 419, 113 S.Ct. 853 (O'Connor, joined by Kennedy, concurring)("Dispositive to this case, however, is an equally fundamental fact: Petitioner is not innocent, in any sense of the word.").

Moreover, while Chief Justice Rehnquist, writing for the Court, at one point states that "our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim," *id.* at 404, 113 S.Ct. 853, this is plainly dictum, for elsewhere he states that "[w]e may assume, for the sake of argument, in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional ...," *id.* at 417, 113 S.Ct. 853. As with the concurring justices, however, the Chief Justice found that Herrera's own "showing of innocence falls far short of that which would have to be made in order to trigger the sort of constitutional claim

---

7. Defendants also assert numerous other grounds, such as under the Sixth and Eighth Amendments, for holding the death penalty statute unconstitutional and/or for not applying it to the remaining defendants in this case. This Opinion And Order does not reach any of these other grounds.

8. This additional letter briefing was requested by the Court after the Government, in its original brief, similarly failed to unearth any prior precedent directly addressing the aforementioned issue.

which we have assumed, *arguendo*, to exist." *Id.* at 418–19, 113 S.Ct. 853.

Ironically, it was only a year or so after *Herrera* was decided that the new availability of DNA testing began to supply the kind of "truly persuasive demonstration" of actual innocence to which Chief Justice Rehnquist had hypothetical alluded. Thus, not only did *Herrera* not reach the issue here presented, but also it was premised on a series of factual assumptions about the unlikelihood that proof of actual innocence would emerge long after conviction that no longer seem sustainable. More generally, as already discussed, it implicitly premised a degree of unlikelihood of wrongful capital convictions that no longer seems tenable.[9]

The issue—not addressed by *Herrera* or, so far as appears, anywhere else—boils down to this. We now know, in a way almost unthinkable even a decade ago, that our system of criminal justice, for all its protections, is sufficiently fallible that innocent people are convicted of capital crimes with some frequency. Fortunately, as DNA testing illustrates, scientific developments and other innovative measures (including some not yet even known) may enable us not only to prevent future mistakes but also to rectify past ones by releasing wrongfully-convicted persons—but only if such persons are still alive to be released. If, instead, we sanction execution, with full recognition that the probable result will be the state-sponsored death of a meaningful number of innocent people, have we not thereby deprived these people of the process that is their due? Unless we accept—as seemingly a majority of the Supreme Court in *Herrera* was unwilling to accept—that considerations of deterrence and retribution can constitutionally justify the knowing execution of innocent persons, the answer must be that the federal death penalty statute is unconstitutional.

■ Consequently, if the Court were compelled to decide the issue today, it would, for the foregoing reasons, grant the defendants' motion to dismiss all death penalty aspects of this case on the ground that the federal death penalty statute is unconstitutional. But prudence dictates that in a matter of such importance, the Court should give the Government—which only now has the benefit of the Court's views on this issue—one last opportunity to be heard before a final determination is reached. Accordingly, the Government, if it chooses, may submit an additional brief on the aforementioned issue by no later than May 15, to which defendants may respond by no later than May 31, following

---

**9.** As the Government notes, Chief Justice Rehnquist's opinion for the Court, while acknowledging the fallibility of any fact-finding system, takes solace not only in the putative unlikelihood of frequent mistakes but also in the availability of executive clemency when all legal remedies are exhausted. In the Chief Justice's view, "Clemency . . . is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." *Herrera*, 506 at 411–12, 113 S.Ct. 853. But subsequent studies show that there has been a precipitous decline in the number of clemencies granted in recent years. As summarized by Professor Banner: "The most noticeable [change in recent years] was the sudden decline of clemency. For centuries governors commuted death sentences in significant numbers. That pattern continued for the first two-thirds of the twentieth century . . . [but] dropped close to zero under the new sentencing schemes [enacted after 1972]." Banner, *supra*, at 291. This is hardly surprising in an age when "law and order" is a political issue, for the executive branch, far more than the judiciary, is inherently sensitive to political pressure. In any event, clemency has no real relevance to the issue now before this Court, for it would be unusual for an executive to stay an execution simply because proof of innocence might *thereafter* develop; yet it is this very real possibility, as demonstrated by the emergence of DNA testing, that creates the constitutional problem here addressed.

which the Court will render a final determination. Alternatively, if the Government prefers to treat this as a final order granting defendants' motion and proceed directly to appeal (assuming such is available), it should so notify the Court, in writing, by no later than May 1, so that a final order may be entered.

SO ORDERED.