**UNITED STATES of America**

v.

**Alan QUINONES, et al., Defendants.**

**No. S3 00 CR. 761(JSR).**

United States District Court, S.D. New York.

July 1, 2002.

David B. Anders, Assist. U.S. Atty., Mary Jo White, U.S. Atty., Crim. Div., New York City, for U.S.

Lee Ginsberg, Freeman Nooter & Ginsberg, New York City, Kevin McNally, Frankfort, KY, for defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

In its Opinion dated April 25, 2002, the Court, upon review of the parties' written submissions and oral arguments, declared its tentative decision to grant defendants' motion to dismiss the death penalty aspects of this case on the ground that the Federal Death Penalty Act, 18 U.S.C. §§ 3591–3598, is unconstitutional. *United States v. Quinones*, 196 F.Supp.2d 416, 420 (S.D.N.Y.2002). Because of the importance of the matter, the Court gave the Government—which now had the benefit of the Court's preliminary views—a further opportunity to be heard. *Id.* The Government duly submitted an extensive brief and exhibits, *see* Government's Memorandum Of Law In Further Opposition To Defendants' Motion ("Govt.Mem."), to which counsel for the two remaining death-eligible defendants, Alan Quinones and Diego Rodriguez, responded in kind, *see* Defendants' Joint Supplemental Memorandum Of Law ("Def.Mem."). The Court expresses its gratitude to counsel for these helpful new papers; but after careful consideration, the Court adheres to its prior view and declares the Federal Death Penalty Act unconstitutional.

The basic reasons for the Court's decision are stated in the Court's Opinion of April 25, 2002, a copy of which is annexed hereto for ready reference; the findings and conclusions set out there are deemed here incorporated and will not be repeated at any length. In brief, the Court found that the best available evidence indicates that, on the one hand, innocent people are sentenced to death with materially greater frequency than was previously supposed and that, on the other hand, convincing

proof of their innocence often does not emerge until long after their convictions. It is therefore fully foreseeable that in enforcing the death penalty a meaningful number of innocent people will be executed who otherwise would eventually be able to prove their innocence. It follows that implementation of the Federal Death Penalty Act not only deprives innocent people of a significant opportunity to prove their innocence, and thereby violates procedural due process, but also creates an undue risk of executing innocent people, and thereby violates substantive due process.

In its most recent submission, the Government raises three overall objections to this conclusion, which are here discussed in the order they appear in the Government's Memorandum:

■ In *Point I* of its Memorandum (Govt.Mem.6–10), the Government argues that the issue of whether the Federal Death Penalty Act is unconstitutional in the foregoing respects is not yet ripe for adjudication in this case, since neither of the defendants has been convicted, let alone sentenced to death. *See generally, Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998). While the Government concedes that the fact that it has filed the statutory "death notice" seeking the defendants' execution gives the defendants standing to challenge the death penalty statute, the Government argues that for the Court to reach the instant issue before it must is equivalent to giving "an advisory opinion of the type that courts have a duty to refrain from disseminating." Govt. Mem. 3.

No one could disagree with the need to refrain from issuing advisory opinions or with the need to exercise judicial restraint, especially when declaring a statute unconstitutional. The trouble with the Government's argument, however, is that the

Court must, in fact, reach the issue now, because the pendency of the death penalty has immediate practical and legal consequences in this case that cannot be postponed.

For example, with the trial of the case firmly scheduled for September 3, 2002, a jury will soon need to be impaneled that, pursuant to the Federal Death Penalty Act, will be required to determine, first, whether the defendants are guilty as charged, and then, if guilt is found, whether the death penalty should be imposed. 18 U.S.C. § 3593(b)(1)(sentence hearing "shall be conducted ... before the jury that determined the defendant's guilt"). Under prevailing Supreme Court precedent, any prospective juror strongly opposed to capital punishment must be excused for cause from sitting on such a jury. *See, e.g., Lockhart v. McCree,* 476 U.S. 162, 170, n. 7, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("the State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence"); *Wainwright v. Witt,* 469 U.S. 412, 424, n. 5, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ("the State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths"); *see also, Morgan v. Illinois,* 504 U.S. 719, 731–734, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The result is to exclude from the jury a significant class of people who would be perfectly fit to serve if the death penalty were absent from the case.

More generally, the very nature of the inquiries that must be made of prospective jurors, both in pre-trial questionnaires and in *voir dire* at the time the jury is chosen, will be radically different depending on whether or not the death penalty is involved, thereby affecting the jurors' entire view of the case.

Further still, the number and ratio of peremptory challenges accorded the parties will differ materially depending on whether or not the death penalty is involved. In a death penalty case, the Government is guaranteed no fewer than 20 peremptory challenges, the same number as the defense, Rule 24(b), Fed.R.Crim.P.; in the absence of the death penalty, the Government has only six peremptory challenges, compared with 10 for the defense, *id.* Thus, in both absolute and relative terms, the Government has a considerably greater opportunity in a death penalty case to shape the jury to its preference than would otherwise be the case.

As these significant impacts of the death penalty on the pending issue of jury selection well illustrate, consideration of the constitutionality of the penalty cannot be delayed until after trial, let alone later, because "the defendants are already directly affected by the death-penalty potential in every aspect of their defense." *Quinones,* 196 F.Supp.2d at 419.

Moreover, the nature of the challenge to the death penalty here presented is essentially a facial challenge, so that the substantive arguments for and against the challenge will be the same at all stages of this proceeding. As defendants note, such challenges to the death penalty have uniformly been adjudicated by district courts at the pre-trial stage. *See* Def. Mem. 30, n. 40 (citing 16 cases); *see also, e.g., United States v. Bin Laden,* 126 F.Supp.2d 290 (S.D.N.Y.2001).[1]

---

**1.** While the Government argues that there is    one case, *United States v. Cuff,* 38 F.Supp.2d

In short, the constitutionality of the death penalty on the ground here under consideration is not only "ripe" for adjudication at this time, it cannot be postponed without material prejudice to the defendants.

■ In *Point II* of its Memorandum (Govt.Mem.10–23), the Government argues that because, in the Government's view, the Framers of the Constitution, the Congress that enacted the Federal Death Penalty Act, and the Supreme Court that addressed that Act in *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), all accepted the constitutionality of administering capital punishment despite the inherent fallibility of the judicial system, even the likelihood that innocent people may mistakenly be executed does not mean that they did not receive the process that was their due or that the statute is inherently flawed. Each component of this argument deserves attention, but each is ultimately unpersuasive.

With respect to the "Framers of the Constitution" (Govt.Mem.10), the Government argues that, because the Fifth Amendment mandates that no person shall "be deprived of *life,* liberty, or property without due process of law" (emphasis supplied), therefore "the drafters of the Constitution themselves assumed the existence of capital punishment, doubtless against a backdrop in which they did not expect flawless administration of the penalty." (Govt.Mem.11). But to "assume the existence" of the death penalty is not the same as endorsing it, and to "not expect flawless

administration" is not the same as countenancing the execution of numerous innocent people.

There is, indeed, no indication that the Framers of the Constitution ever considered the issue of the death penalty as a substantive matter; they were simply concerned with extending due process to the full range of existing proceedings. As previously noted, *see Quinones,* 196 F.Supp.2d at 418 n. 6, at the time the Constitution was drafted in 1787 the death penalty was a common punishment in the various states for a wide variety of personal and property offenses, ranging from murder and rape to fraud and theft. *See* Stuart Banner, *The Death Penalty: An American History* 5–23, 88–111 (2002). There was no reason to believe that federal actions would be any different. Consequently, in guaranteeing due process of law to all deprivations of life, liberty and property, the drafters of the Constitution were simply applying due process to the full panoply of anticipated actions, rather than endorsing or even commenting on any particular kind of deprivation.

■ Furthermore, nothing suggests that the Framers regarded due process as a static concept, fixed for all time by the conditions prevailing in 1787. Just as it is settled law that the Eighth Amendment's prohibition of "cruel and unusual punishment" must be interpreted in light of "evolving standards of decency," *Atkins v. Virginia,* —— U.S. ——, 122 S.Ct. 2242, 2246–47, —— L.Ed.2d —— (2002), *quoting*

282 (S.D.N.Y.1999), in which facial constitutional challenges to the death penalty were considered premature at the pre-trial stage, in actuality the Court in *Cuff* adjudicated at the pre-trial stage *all* the claims presented (facial and otherwise) that the death penalty was unconstitutional *except* for the issue of whether the statute unconstitutionally restricts the scope of *appellate* review, holding that this

was an issue more properly addressed by the appellate court and that, even assuming *arguendo* the issue had merit (which numerous prior courts had found it did not), "the proper remedy would appear to be an enlargement of the scope of appellate review, not reversal of the death penalty or invalidation of the statute generally." *Id.* at 286.

*Trop v. Dulles*, 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), so too it is settled law that the Fifth Amendment's broad guarantee of "due process" must be interpreted in light of evolving standards of fairness and ordered liberty. *See, e.g., Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846–851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Rochin v. California*, 342 U.S. 165, 171–172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). To freeze "due process" in the precise form it took in 1787 would be to freeze it to death.

With respect to the Congress that enacted the Federal Death Penalty Act in 1994, the Government argues that it was "a Congress that well understood—and fully debated—whether the FDPA should be given effect despite the risk that innocent individuals might be sentenced to death" and that "Congress determined that enactment was warranted, based at least in part upon a balancing of defendant's rights against the rights of innocent victims." (Govt.Mem.11–12). The Government's showing in support of these broad claims is, however, wholly inadequate, for the

Government cites, not to any of the formal history of the Act, but to a few spare comments on the floor of Congress, some of them made (as the Government concedes) six years prior to the enactment of the Federal Death Penalty Act in reference to a different statute.[2]

The simple fact is that none of the committee reports that comprise the primary legislative history of the Federal Death Penalty Act contains even a single passage supporting the Government's claim. *See* H.R. Conf. Rep. No. 103–711, U.S.Code Cong. & Admin.News 1994, p. 1839 (1994); H.R. Conf. Rep. No. 103–694, U.S.Code Cong. & Admin.News 1994, p. 1839 (1994); H.R. Rep. 103–489 (1994); H.R. Reps. Nos. 103–466 and 103–467 (1994); H.R.Rep. No. 103–324 (1993).[3] Indeed, the total absence of the Government's hypothesized "debate" from the formal history of the Act tends, if anything, to confirm the Court's view that members of Congress had no occasion in 1994 to weigh, in Benthamite fashion, a supposed balance of innocent lives saved and innocent lives lost as a result of the imposition of the death penalty.[4] Had they done so, moreover, the

**2.** These deficiencies are characteristic not only of the three quotations in the Government's original brief, Govt. Mem. 12 n. 3, but also of the additional citations that the Government added to this part of its brief in a letter to the Court dated May 17, 2002. For example, the Government quotes an unnamed Senator as stating, at "134 Cong. Rec. S15699–01," that "This Senator believes that there has to be an analysis and a balancing of victims' rights, and I am absolutely convinced that the presence of the death penalty will save innocent people and will be effective in dissuading criminals." However, the quotation actually appears at 134 Cong. Rec. S15669–01, the speaker is Senator Specter, the subject is the Omnibus Drug Initiative Act, the statement was made in 1988 (six years before passage of the Federal Death Penalty Act), and, most importantly, the Senator prefaces his statement by postulating that "today with the array of rights which a defendant has

and with the current levels of scrutiny, review, and proof of aggravating circumstances and evaluation of mitigating circumstances, it seems to me that the risk [of an innocent person being sentenced to death] is *very, very remote indeed*." *Id.* (emphasis supplied). Thus, read in context, Senator Specter's statement actually supports the Court's conclusion that, prior to the recent discoveries on which the instant Opinion relies, the prevailing view was that sentencing an innocent person to death was an extremely unlikely event.

**3.** No Senate Report was ever submitted with this legislation. *See* 1994 U.S.C.C.A.N. 1802.

**4.** Such cold-blooded utilitarianism would have been uncharacteristic of Congress, which, experience suggests, is much more likely to favor the Kantian, "Golden Rule" approach characteristic of the world's great religions. Under that latter approach, the

debate would have been entirely speculative, for whatever the merits of the studies supporting the deterrent effect of the death penalty,[5] it was not until after the enactment of the Federal Death Penalty Act in 1994 that the most clear and compelling evidence of innocent people being sentenced to death chiefly emerged, *i.e.*, the DNA testing that established conclusively that numerous persons who had been convicted of capital crimes (by "proof beyond a reasonable doubt") were, beyond any doubt, innocent. *Quinones*, 196 F.Supp.2d at 417.

Moreover, even if one were to suppose, contrary to fact, that the Congress that enacted the Federal Death Penalty Act undertook a "death calculus" and somehow weighed (through sheer speculation) the number of innocent lives that would be saved by the presumed added deterrent impact of the death penalty against the number of innocent lives that would be lost by innocent people being mistakenly executed, this would not be dispositive of the issue before this Court. As Justice O'Connor stated for the Supreme Court in *Planned Parenthood of Southeastern Pennsylvania*, 505 U.S. at 851, 112 S.Ct. 2791, while "[i]t is conventional constitutional doctrine that where reasonable people disagree the government can adopt one position or the other [citations omitted] . . . [t]hat theorem, however, assumes a state of affairs in which the choice does not intrude upon a protected liberty." If protection of innocent people from state-sponsored execution is a protected liberty, and if such protected liberty includes the right

of an innocent person not to be deprived, by execution, of the opportunity to demonstrate his innocence, then Congress may not override such liberty absent a far more clear and compelling need than any presented here.

Which brings us to the Supreme Court's 1993 decision in *Herrera v. Collins, supra.* In its original briefing to this Court, the Government asserted that, while *Herrera* inferentially supported the Government's position, it did not directly address the issue now before the Court. *See Quinones*, 196 F.Supp.2d at 419. Now, however, the Government proclaims that *Herrera* is "fatal to defendants' motion" (Govt.Mem.14) and not only "does not lend support to this Court's preliminary ruling; it forecloses it" (Govt.Mem.4). These new contentions are, however, entirely unsupportable.

While much of *Herrera* is *dictum*, its actual holding is not difficult to discern. Ten years after his conviction of capital murder, and quite some years after having exhausted his state and federal, direct and collateral appeals, Herrera, who was facing imminent execution in Texas, sought to reopen his case on the basis of belatedly-produced largely-hearsay affidavits. After the Texas courts denied his application as untimely, he sought federal habeas corpus relief, contending that, notwithstanding the belated and successive nature of his petition, his claim of actual innocence entitled him, under the Eighth and Fourteenth Amendments, to re-open his case. While the Supreme Court, in rejecting this claim, spent considerable time in describing puta-

---

relevant question would presumably be: "Are you prepared to apply to yourself a legal process that would execute you for a crime you never committed before you were able to finally prove your innocence?"

**5.** Justice Breyer, summarizing the most recent studies of the deterrent effect of the

death penalty in his concurring opinion last week in *Ring v. Arizona*, U.S., —— U.S. ——, ——, 122 S.Ct. 2428, —— L.Ed.2d ——, 2002 WL 1357257, at *20 (June 24, 2002), concluded that "Studies of [death penalty] deterrence are, at most, inconclusive."

tive shortcomings in petitioner's approach, the Court's actual holding was as follows:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high. The showing made by petitioner in this case falls far short of any such threshold.

506 U.S. at 417, 113 S.Ct. 853.

Any doubt that this is the Court's holding (and that, indeed, such language was necessary to obtain the assent of two of the five justices, O'Connor and Kennedy, who joined in the majority) is laid to rest by the concurring opinion of Justice O'Connor, joined in by Justice Kennedy, which expressly states that "the execution of a legally and factually innocent person would be a constitutionally intolerable event" but that petitioner has failed to make the kind of persuasive showing necessary to consider such a claim at this belated stage. 506 U.S. at 420, 113 S.Ct. 853. Justice O'Connor continues:

> Ultimately, two things about this case are clear. First is what the Court does *not* hold. Nowhere does the Court state

that the Constitution permits the execution of an actually innocent person. Instead, the Court assumes for the sake of argument that a truly persuasive demonstration of actual innocence would render any such execution unconstitutional and that federal habeas relief would be warranted if no state avenue were open to process the claim. Second is what petitioner has not demonstrated. Petitioner has failed to make a persuasive showing of actual innocence.

506 U.S. at 427, 113 S.Ct. 853.

So too, Justice White, declining to join in the five-justice majority opinion, stated in his opinion concurring in the judgment that "In voting to affirm, I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case." 506 U.S. at 429, 113 S.Ct. 853.

As for the dissent by Justice Blackmun, joined by Justices Stevens and Souter, it too confirms that "the long and general discussion that precedes the Court's disposition of this case ... is dictum because the Court assumes ... 'that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional.'" 506 U.S. at 430, 113 S.Ct. 853.

From the foregoing, several things follow as to the relevance, or irrelevance, of *Herrera* to the instant case:

First, *Herrera* does not address the issue presented in the instant case.[6]

---

**6.** This is still further confirmed (if such confirmation were even needed) by the express declination of the majority opinion in *Herrera* to reach any issue of substantive due process. 506 U.S. at 408, n. 6, 113 S.Ct. 853. *Cf.*

*Quinones,* 196 F.Supp.2d at 418, n. 6. As previously noted, considerations of both substantive and procedural due process inform the decision of the instant Court: the fundamental notion that execution of the innocent

Second, the *Herrera* Court's sole holding is that a belated or successive habeas petitioner must make a persuasive showing of actual innocence to warrant habeas relief. Thus, the Government's argument here that *Herrera* "forecloses" defendants' instant claim because they have not made a showing of "actual innocence" (Govt.Mem.4) seriously misreads *Herrera.* It is only in the context of a belated or successive habeas petition that the Court in *Herrera,* in furtherance of finality and of minimizing the substantial difficulties of a belated re-trial, requires such a threshold showing. By contrast, in the pre-trial posture of the instant motion, where no such concerns are present and where both defendants are presumed innocent,[7] no special threshold showing is required, and the Government's attempt to invent one is wholly without support.

Third, the only other conclusion that appears to command a majority of the justices is that executing the innocent is forbidden by the Constitution, with five of the justices (O'Connor, Kennedy, and the three dissenters) expressly stating this view. (Of the other four, two—Rehnquist and White—assume it *arguendo,* and the other two, Scalia and Thomas, in a separate concurring opinion, reject it.) At a minimum, this casts the most serious doubt on the Government's aforementioned claim that Congress, in the exercise of its legislative prerogatives, could constitutionally decide to knowingly execute a foreseeable class of mistakenly convicted but actually innocent persons in the belief that their deaths were outweighed by the potential deterring of the murders of other innocent persons.

Fourth, while the Government correctly notes (Govt.Mem.19–20) that both the majority and dissenting opinions in *Herrera* briefly discuss the implications for the death penalty of the inherent fallibility of any system of justice, that discussion is not informed by the ground-breaking DNA testing and other exonerative evidence developed in the years since. Rather, the essential premise of the discussion, as well captured in Justice O'Connor's crucial concurring opinion, is that "our society has a high degree of confidence in its criminal trials, in no small part because the Constitution offers unparalleled protections against convicting the innocent." 506 U.S. at 420, 113 S.Ct. 853. In light of the subsequently-developed evidence, that "high degree of confidence" is no longer tenable, and the whole discussion has been placed on a new footing.

In sum, the Court remains unpersuaded that anything in *Herrera,* the legislative history of the Federal Death Penalty Act, or the Due Process clause itself precludes

---

is a constitutionally intolerable event sounds in substantive due process, and the corollary that an innocent person should not be deprived by execution of the opportunity, even belatedly, of coming forward with conclusive proof of his innocence sounds in procedural due process.

7.  The Government's rather extraordinary attempt (Govt.Mem.18) to suggest, in effect, that because defendant Rodriquez allegedly "confessed" during his confidential proffer session with the Government he is somehow not entitled to the presumption of innocence in terms of this motion, is not supported by any case law whatever. Whether, in addition,

as alleged by Rodriguez's counsel in his letter to the Court dated May 23, 2002, the Government's public reference to the proffer session violates the Government's written pledge of confidentiality will be the subject of a separate opinion of this Court. But it is noteworthy that the Government responds to that charge by asserting, in its letter to the Court dated May 30, 2002, that its public reference to the proffer is justified by Rodriguez's having, by this motion, effectively asserted his actual innocence—the very opposite of the Government's argument on this motion that Rodriquez has failed to do so (Govt.Mem.18).

the decision here reached. If anything, the combined view of five justices in *Herrera* that execution of the innocent is constitutionally impermissible supports the instant decision.[8]

Finally, in *Point III* of its Memorandum (Govt.Mem.24–36), the Government argues that the evidence on which the Court premises its legal conclusions is either unreliable, irrelevant, or both. Again, each component of this argument, upon scrutiny, proves unconvincing.

Regarding the DNA testing that has exonerated at least 12 death row inmates since 1993, *Quinones,* 196 F.Supp.2d at 417, *see* Def. Mem. 4–5, the Government argues that, since such testing is now available prior to trial in many cases, its effect, going forward, will actually be to reduce the risk of mistaken convictions. Govt. Mem. 25–26. This completely misses the point. What DNA testing has proved, beyond cavil, is the remarkable degree of fallibility in the basic fact-finding processes on which we rely in criminal cases. In each of the 12 cases of DNA-exoneration of death row inmates referenced in *Quinones,* the defendant had been found guilty by a unanimous jury that concluded there was proof of his guilt beyond a reasonable doubt; and in each of the 12 cases the conviction had been affirmed on appeal, and collateral challenges rejected, by numerous courts that had carefully scrutinized the evidence and the manner of conviction. Yet, for all this alleged "due process," the result, in each and every one of these cases, was the conviction of an innocent person who, because of the death penalty, would shortly have been executed (-some came within days of being so-) were it not for the fortuitous development of a new scientific technique that happened to be applicable to their particular cases.

DNA testing may help prevent some such near-tragedies in the future; but it can only be·used in that minority of cases involving recoverable, and relevant, DNA samples. Other scientific techniques may also emerge in the future that will likewise expose past mistakes and help prevent future ones, and in still other cases, such as those referenced below, exoneration may be the result of less scientific and more case-specific developments, such as witness recantations or discovery of new evidence. But there is no way to know whether such exoneration will come prior to (or during) trial or, conversely, long after conviction.[9] What is certain is that, for the foreseeable future, traditional trial methods and appellate review will not prevent the conviction of numerous innocent people.

Where proof of innocence is developed long after both the trial and the direct appeal are concluded, it is entirely appropriate that the defendant make a truly persuasive showing of innocence, as *Herrera* requires, before his case can be reopened. But given what DNA testing has exposed about the unreliability of the primary techniques developed by our system

8.  While the Government also makes the argument in its "Point II" that the Federal Death Penalty Act provides unusually ample procedural protections to the accused (Govt.Mem.20–23), this is more conveniently addressed in connection with the discussion of Point III, *infra.*

9.  In one Government study of 28 cases of post-conviction exoneration of various crimes based on DNA testing, the average defendant had spent 7 years in prison before his innocence was uncovered. National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial* (1996)("National Institute of Justice DNA Study") at iii.

for the ascertainment of guilt, it is quite something else to arbitrarily eliminate, through execution, any possibility of exoneration after a certain point in time. The result can only be the fully foreseeable execution of numerous innocent persons.

While the DNA evidence alone is sufficient to establish this basic point, the Court, in its Opinion of April 25, also relied on the even larger number of death row inmates who have been exonerated over the past decade by investigations that, while inspired by the DNA testing, used more conventional methods. *See Quinones*, 196 F.Supp.2d at 418. Although, as the Government notes in its Memorandum (Govt.Mem.34–35) and as the Court itself noted in its prior Opinion (*see Quinones* at 418 n. 5), the website of the Death Penalty Information Center ("DPIC") that lists these cases may be over-inclusive,[10] the Court, upon review of the underlying case summaries, conservatively concluded that at least 20 such defendants released from death row over the past decade for reasons unrelated to DNA testing were factually innocent. *Quinones* at 418.[11] These included people like Joseph Burrows, who was released after 5 years on death row only after the state's chief witness against him confessed to the murder; Anthony Porter, who spent no less than 16 years on death row until prosecutors decided they had made a mistake (upon which determination they then brought murder charges against a different suspect, who confessed); and Gary Drinkard, whose 1995 conviction and death sentence were overturned in 2001 only after an entire team of lawyers and investigators uncovered conclusive proof that he was at home at the time of the murder for which he was charged. Because, moreover, DNA testing was not applicable to these cases and they therefore required a more onerous investigation before innocence could be proved to the high degree necessary to satisfy the relevant court or prosecutor, these additional 20 innocent convicts served an average of 10 years in prison before their innocence was established.

**10.** This is not to say, however, that there is any basis for the Government's contention that the data and case summaries set forth in the DPIC website (as opposed to DPIC's interpretations of those data and summaries) are unreliable. *See* Govt. Mem. 34–35. Upon review of the substantial record provided by the parties, the Court is satisfied that the DPIC employs, as it attests (*see* Def. Mem. Ex. A), reasonably strict and objective standards in listing and describing the data and summaries that appear on its website.

**11.** Exhibit A to the Def. Mem. lists the names and details of the 12 death row defendants exonerated since 1993 by DNA testing, plus 20 other, non-DNA death row exonerations since *Herrera* that defendants have correctly intuited satisfy the Court's conservative criterion of prisoners who were "released on grounds indicating factual innocence." *Quinones*, 196 F.Supp.2d at 418, n. 5. The 32 names (with numbers corresponding to their DPIC website listings) are: 53. Kirk Bloodsworth; 54. Federico M. Macias; 55. Walter McMillian; 59. Andrew Golden; 60. Joseph Burrows; 63. Rolando Cruz; 64. Alejandro Hernandez; 66. Verneal Jimerson; 67. Dennis Williams; 68. Roberto Miranda; 69. Gary Gauger; 70. Troy Lee Jones; 72. Ricardo Aldape Guerra; 73. Benjamin Harris; 76. Robert Lee Miller, Jr.; 78. Shareef Cousin; 79. Anthony Porter; 80. Steven Smith; 81. Ronald Keith Williamson; 82. Ronald Jones; 83. Clarence Richard Dexter; 86. Steve Manning; 88. Joseph Nahume Green; 89. Earl Washington; 91. Frank Lee Smith; 92. Michale Graham; 93. Albert Burrell; 94. Peter Limone; 97. Jeremy Sheets; 98. Charles Irvin Fain; 99. Juan Robert Melendez; and 100. Ray Krone. Moreover, even under the Court's cautious approach, substantial arguments could be made for adding at least 8 other names to the list, namely: 56. Gregory R. Wilhoit; 65. Sabrina Butler; 74. Robert Hayes; 77. Curtis Kyles; 85. Alred Rivera; 90. William Nieves; 95. Gary Drinkard; and 101. Thomas H. Kimbell, Jr.

*See* Def. Mem. Ex. A (listing dates of convictions and releases).

The Government does not deny that an increasing number of death row defendants have been released from prison in recent years for reasons other than DNA testing. Nor does the Government, despite its quibbles with the DPIC website, directly contest the Court's conservative conclusion that at least 20 of these non-DNA exonerations likely involved the capital convictions of innocent persons. Instead, the Government argues that both the DNA and non-DNA exonerations are irrelevant to consideration of the Federal Death Penalty Act because the exonerated defendants were all state convicts, rather than federal. Govt. Mem. 27–29. This, moreover, is no accident, argues the Government, but is rather the result of the allegedly greater protections that federal procedure generally, and the Federal Death Penalty Act in particular, afford defendants. Govt. Mem. 20.

Upon analysis, however, the Government's distinction proves ephemeral, for several reasons. To begin with, while it true that none of the 31 persons so far sentenced to death under the Federal Death Penalty Act has been subsequently exonerated (-though five of the sentences have already been reversed, *see* Govt. Mem. 27–28-), the sample is too small, and the convictions too recent, to draw any conclusions therefrom. The 32 exonerated death row inmates identified by the Court in its prior Opinion, *see Quinones*, 196 F.Supp.2d at 417–418, are part of a relevant pool of anywhere from around 800 to around 3,700 death row inmates, depending on how you look at it.[12] As previously noted, moreover, the time-lag between conviction and exoneration for the 32 exonerated inmates averaged somewhere in the range of 7 to 10 years after conviction. Consequently, if federal practices were equally as vulnerable to wrongful capital convictions as state practices, still, on any reasonable statistical analysis, one would not expect any exonerations to have yet emerged with respect to a sample as small as 31 federal capital convicts, none of whom was sentenced before 1995.[13]

More fundamentally, there is no logical reason to suppose that practices and procedures under the Federal Death Penalty Act will be materially more successful in preventing mistaken convictions than the deficient state procedures that have already been shown to be wanting. By virtue of the Fourteenth Amendment, all the primary protections are the same in both systems: proof beyond a reasonable doubt, trial by jury, right to effective assistance of counsel, right of confrontation, etc.

---

**12.** According to the DPIC website, the total of state and federal convicts on death row increased by 811 between 1994 and the end of 2001. *See www.deathpenaltyinfo.org/DRowInfo.html# year*. According to yesterday's New York Times, the total number of persons (state and federal) sentenced to death since the death penalty was revived in 1976 is 3,701. *See N.Y. Times,* June 30, 2002, chart at section 4, p. 16.

**13.** It may also be noted that, as the Government concedes, at least one of the 31 federal death row inmates, David Ronald Chandler, had a colorable claim of actual innocence, but his sentence was commuted by President Clinton. Govt. Mem. 28. However, although the commutation was seemingly prompted by serious doubts about Chandler's guilt, *see* Def. Mem. 19, it should also be noted that Chandler was not granted a full pardon. More generally, as noted in the Court's prior Opinion, *see Quinones* at 420 n. 9, the use of executive clemency to rectify wrongful death penalty convictions, always a haphazard remedy at best, has significantly diminished in recent years, notwithstanding the greater number of cases of proven innocence. Clemency, moreover, cannot address the problem of the mistakenly convicted defendant who is executed before he can prove his innocence.

If anything, certain federal practices present a greater risk of wrongful capital convictions than parallel state practices. For example, federal practice, in contrast to that of many states that allow the death penalty, permits conviction on the uncorroborated testimony of an accomplice. *Compare, e.g., United States v. Gordon*, 987 F.2d 902, 906 (2d Cir.1993)("conviction may be sustained on the basis of the testimony of a single accomplice"); *United States v. Baker*, 985 F.2d 1248, 1255 (4th Cir.1993)(same) *with, e.g.*, Ala.Code § 12–21–222 (prohibiting conviction based solely on uncorroborated testimony of accomplice); Cal.Penal Code § 1111 (same); Nev. Rev. Stat § 175.291 (same); N.Y.Crim. Proc. Law § 60.22 (same); Or. Rev.Stat. § 136.440 (same); S.D. Cod. Laws § 23A–22–8 (same); Tex.Code Crim. Pro., art. 38.14 (same).[14] Similarly, federal practice treats circumstantial evidence identically to direct evidence and permits conviction based solely on such evidence, whereas many states that allow the death penalty permit a conviction based solely on circumstantial evidence only if such evidence excludes to a moral certainty every other reasonable inference except guilt. *Compare, e.g., United States v. Russell*, 971 F.2d 1098, 1108–09 (4th Cir.1992)("a jury need not be instructed that circumstantial evidence must be so strong as to exclude every reasonable hypothesis other than guilt") *with, e.g., Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690, 694 (2000)(where conviction based solely on circumstantial evidence, the evidence must "show guilt to a moral certainty, and must exclude every

other reasonable hypothesis than that of the guilt of the accused"); *Jackson v. State*, 758 N.E.2d 1030, 1036 (Ind.Ct.App. 2001)(same); *People v. Giuliano*, 65 N.Y.2d 766, 492 N.Y.S.2d 939, 482 N.E.2d 557, 558 (1985)(same).

Even more fundamentally, it appears reasonably well established that the single most common cause ·of mistaken convictions is inaccurate eye-witness testimony. As recently summarized by Senior Circuit Judge Jon O. Newman of the Second Circuit:

> Experience has shown that in some cases juries have been persuaded beyond a reasonable doubt to convict and vote the death penalty even though the defendant is innocent. The most common reason is that one or more eyewitnesses said they saw the defendant commit the crime, but it later turned out that · they were· mistaken,· as eyewitnesses sometimes are.

Newman, "Make Judges Certify Guilt In Capital Cases," Newsday, July 5, 2000, p. A25.[15] *See also, e.g., National Institute of Justice DNA Study, supra*, at 15; Def. Mem. 23. The federal rules of evidence are no less receptive to such eye-witness testimony than state rules, and federal courts, at both the trial and appellate levels, apply, even more than state courts, highly deferential standards to jury findings premised on such testimony.

Accordingly, there is no good reason to believe the federal system will be any more successful at avoiding mistaken impositions of the death penalty than the

---

**14.** According to the Government, the instant case against defendant Quinones relies heavily, though not exclusively, on the testimony of accomplices. *See* Govt. Mem. 18, n.6.

**15.** Judge Newman's "op-ed" piece, prompted by the controversial execution of Gary Graham in Texas, *see* Def. Mem. 18, suggests that legislatures might be able to reduce the risk of wrongful capital convictions to arguably ac-

ceptable levels by requiring the trial judge to certify, as a precondition to imposing the death penalty, that guilt has been proved, not only beyond reasonable doubt, but to a certainty. Whether such a legislative solution could solve the due process problems here presented is well beyond the scope of this Opinion.

error-prone state systems already exposed.

In its Opinion of April 25, the Court also supported its overall conclusions by reference to the unusually high rate of legal error (68%) detected in appeals (both state and federal) from death penalty convictions, as shown by the comprehensive study of those appeals released in 2000 by Professor James Liebman and his colleagues. *See Quinones*, 196 F.Supp.2d at 418. While legal error is not a direct measure of factual error, Liebman's study was concerned with errors that the appellate courts had determined were not harmless and that therefore could be outcome-determinative. *See* James S. Liebman, et al., *A Broken System: Error Rates In Capital Cases, 1973–1995* (2000) at 32. That such errors could infect nearly 7 out of every 10 capital cases strongly suggests that, at a minimum, the trial process appears to operate with less reliability in the context of capital cases than elsewhere. Moreover, Liebman and his colleagues conclude, in a recently-released follow-up analysis of their data, that the 68% error rate if anything understates the extent of the problem so far as factually mistaken capital convictions are concerned. *See* James S. Liebman, et al., *A Broken System, Part II: Why There Is So Much Error In Capital Cases, And What Can Be Done About It* (2002), at 25.

In response, the Government launches an extended, and remarkably personal attack on Liebman and his study, annexing critical press releases from elected officials such as the Attorney General of Montana and the Governor of Florida, and even arguing that the study is suspect because Liebman (though only one of the six authors of the study) is, allegedly, an avowed opponent of the death penalty. Govt Mem. 30–31. As convincingly shown, however, in the Brief Amicus Curiae Of 42 Social Scientists filed in response, the Liebman study, commissioned at the behest of the Chairman of the U.S. Senate Judiciary Committee, is by far the most careful and comprehensive study in this area, and one based, moreover, exclusively on public records and court decisions.[16]

When it comes to something as fundamental as protecting the innocent, press releases and ad hominem attacks are no substitute for reasoned discourse, and the fatuity of the Government's attacks on Liebman's study only serves to highlight the poverty of the Government's position. At the same time, no judge has a monopoly on reason, and the Court fully expects its analysis to be critically scrutinized. Still, to this Court, the unacceptably high rate at which innocent persons are convicted of capital crimes, when coupled with the frequently prolonged delays before such errors are detected (and then often only fortuitously or by application of newly-developed techniques), compels the conclusion that execution under the Federal Death Penalty Act, by cutting off the opportunity for exoneration, denies due process and, indeed, is tantamount to foreseeable, state-sponsored murder of innocent human beings.

Accordingly, the Court grants defendant's motion to strike all death penalty aspects from this case, on the ground that the Federal Death Penalty Act is unconstitutional.

SO ORDERED

---

16. It may also be noted that Justice Breyer, in his concurring opinion last week in *Ring, supra*, —— U.S. at ——, 122 S.Ct. 2428, ——, 2002 WL 1357257 at *20–*22, relies repeatedly on the Liebman studies, noting that even those scholars who have been critical of many other studies in this area have been generally approving of the Liebman studies. *Id.*