313 F.3d 49
 UNITED STATES of America, Appellant,
v.
Alan QUINONES and Diego B. Rodriguez, Defendants Appellees,
Hector Vega, a/k/a Jimbo; Janet Soto; Milton Rivera; Joseph C. Brown; Johnny Rodriguez, a/k/a Blaze; Saul Hernandez; Raul Hernandez, a/k/a "Twin", a/k/a Carlos P. Luis; and Robert Veve, Defendants.
 Docket No. 02-1403(L).
 Docket No. 02-1405(Con).
 United States Court of Appeals, Second Circuit.
 Argued: October 21, 2002.
 Decided: December 10, 2002.
 
 COPYRIGHT MATERIAL OMITTED Meir Feder, Assistant United States Attorney (David B. Anders and David Rody, Assistant United States Attorneys, on the brief), for James B. Comey, United States Attorney for the Southern District of New York, New York, NY, for Appellant.
 Samuel R. Gross, University of Michigan Law School, Ann Arbor, MI (Don D. Buchwald, Buchwald & Kaufman, New York, NY; Lee Ginsberg, Freeman, Nooter & Ginsberg, New York, NY; Jean Barrett, Ruhnke & Barrett, Montclair, NJ; Kevin McNally, Frankfort, KY; Avraham Moskowitz, Moskowitz & Book, New York, NY, on the brief), for Defendants-Appellees.
 Barry C. Scheck, Innocence Project, Cardozo School of Law (Joshua L. Dratel, Peter Neufeld, on the brief), New York, NY, for Innocence Project, the National Association of Criminal Defense Attorneys, and New York Association of Criminal Defense Lawyers, Amicus Curiae.
 Christopher Dunn, Arthur Eisenberg, and Donna Lieberman, New York Civil Liberties Union, New York, NY; Diann Rust-Tierney, American Civil Liberties Union Capital Punishment Project, Washington, DC; and Ursula Bentele, Brooklyn, NY, for New York Civil Liberties Union and American Civil Liberties Union Capital Punishment Project, Amicus Curiae.
 Before: WINTER, McLAUGHLIN, and CABRANES, Circuit Judges.
 JOSÉ A. CABRANES, Circuit Judge:
 
 
 1
 We consider here a challenge to the constitutionality of the Federal Death Penalty Act of 1994 ("FDPA"), Pub.L. No. 103-322, Title VI, §§ 60001-60026, 108 Stat.1959 (Sept. 13, 1994) (codified at 18 U.S.C. §§ 3591-3598).
 
 
 2
 Defendants Alan Quinones and Diego Rodriguez were indicted for, inter alia, murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 2. Shortly thereafter, the Government filed notices of its intention to seek the death penalty against them. In response, Quinones and Rodriguez filed a motion to strike the death penalty notices on the ground that the FDPA is unconstitutional. In a preliminary Opinion and Order entered on April 25, 2002, the United States District Court for the Southern District of New York (Jed S. Rakoff, Judge) indicated its intention to hold that the FDPA violates the Due Process Clause of the Fifth Amendment because DNA testing has demonstrated that "innocent people are convicted of capital crimes with some frequency." United States v. Quinones, 196 F.Supp.2d 416, 420 (S.D.N.Y.2002) ("Quinones I"). After affording the Government an opportunity to submit additional briefing on this issue, the District Court reaffirmed its preliminary views in an Opinion and Order entered on July 1, 2002. United States v. Quinones, 205 F.Supp.2d 256 (S.D.N.Y.2002) ("Quinones II"). It held that (1) the constitutionality of the FDPA was ripe for adjudication prior to trial and (2) the FDPA violates substantive and procedural due process rights guaranteed by the Fifth Amendment. The Government timely filed this appeal. Id.
 
 
 3
 As an initial matter, we hold that (1) we have jurisdiction to entertain this appeal and (2) the constitutional challenge was ripe for consideration prior to trial. Accordingly, we must address the appellant's substantive claim and the District Court's holding that the FDPA is unconstitutional on its face. We hold that, to the extent the defendants' arguments rely upon the Eighth Amendment, their argument is foreclosed by the Supreme Court's decision in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). With respect to the defendants' Fifth Amendment due process claim, we observe that the language of the Due Process Clause itself recognizes the possibility of capital punishment. Moreover, the defendants' argument that execution deprives individuals of the opportunity for exoneration is not new at all — it repeatedly has been made to the Supreme Court and rejected by the Supreme Court. Most notably, the Supreme Court expressly held in Herrera v. Collins, 506 U.S. 390, 407-08, 411, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), that, while the Due Process Clause protects against government infringement upon rights that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," there is no fundamental right to a continued opportunity for exoneration throughout the course of one's natural life. Because neither the Court of Appeals nor the District Court is authorized to disregard or overturn the Supreme Court's holding in Herrera, see, e.g., Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), we reverse the order of the District Court.
 
 I.
 
 4
 On July 20, 2000, a grand jury sitting in the Southern District of New York returned Indictment 00 CR. 761(JSR), charging ten defendants, including Alan Quinones and Diego Rodriguez, with, inter alia, the murder of Edwin Santiago in aid of racketeering activity. Specifically, Counts One and Two charged Quinones, Rodriguez, and two others with racketeering and racketeering conspiracy, in violation of 18 U.S.C. § 1962(c), (d). Count Three charged Quinones, Rodriguez, and others with conspiracy to murder in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(5) and 2, and Count Four charged the same defendants with murder in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(1) and 2. Count Five charged Quinones and Rodriguez, among others, with conspiracy to distribute heroin and cocaine in violation of 21 U.S.C. § 846.
 
 
 5
 On January 16, 2001, the grand jury returned a superseding indictment adding Counts Six and Seven. Count Six charged Quinones with unlawfully distributing a controlled substance in violation of 21 U.S.C. §§ 812, 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2, and Count Seven charged another defendant with the same offense. On April 19, 2002, the grand jury returned a second superseding indictment, adding Count Eight, which charged Quinones, Rodriguez, and others with murder in connection with a drug trafficking crime, in violation of 21 U.S.C. § 848(e)(1)(A). Counts Four and Eight of the second superseding indictment are death-eligible offenses. See 18 U.S.C. §§ 848(e)(1)(A) and 1959(a)(1).[1]
 
 
 6
 On October 26, 2001, the Government filed notices of its intention to seek the death penalty against defendants Quinones and Rodriguez. That same day the District Court held a pre-trial conference to discuss, inter alia, a schedule for death-penalty-related motions. During the conference, the Court, acting sua sponte, raised the issue of whether the FDPA might be unconstitutional:
 
 
 7
 I will tell you one issue that I would think might be helpful to the court to have briefed. I am not suggesting that, because it is not my place to suggest any particular motion for either side. That is why we have an adversary system. And I do not claim any great expertise in prior decisions relating to the death penalty, but I am aware just from common knowledge that there have been a large number of cases, large may be not quite the right word, but certainly a number of reported cases recently, chiefly as a result of DNA testing, that have indicated that an innocent person was convicted and not so completely rarely as to make it appear totally aberrational.
 
 
 8
 So I guess the question that that would lead any reasonable person to ask is[:] is a form of penalty that precludes forever rectification of err[or]s that go to actual innocence a form of penalty that accords with the Constitution? It seems to me this is different from how things might have appeared three, four, five years ago or when earlier litigation under the death penalty statute may have arisen, because at that time, while everyone knows that no system of law is perfect and no system or procedure is perfect, and therefore there will be mistakes made even in the very best of all systems, that was essentially viewed, I think it's fair to say, as a fairly remote hypothetical. Now it would appear that it's neither a hypothetical nor so remote. And I wonder if that changes the legal framework in which such an argument would have to be addressed.
 
 
 9
 I want to stress again, I am not inviting any motion, and I am certainly not indicating any view of the court as to any particular point of view or argument. I just simply raised that because the court, like counsel, would benefit from being educated as to everything that is relevant to a death penalty case.
 
 
 10
 Tr. of Pre-Trial Conference, Oct. 26, 2001, at 9-10. Not surprisingly, shortly after the pre-trial conference, Quinones and Rodriguez each moved for an order striking the death penalty notices based, in part, on the argument that the FDPA is unconstitutional on its face.
 
 
 11
 On March 15, 2002, the District Court heard oral argument on the defendants' motion, and on April 25, 2002, the Court filed a preliminary opinion indicating its intention to declare the FDPA unconstitutional. Quinones I, 196 F.Supp.2d 416. Based upon information obtained from a death-penalty-related internet site, the District Court proposed to take notice that 12 defendants sentenced to death in state courts have been exonerated by DNA evidence in the past decade. Id. at 417.[2] It therefore concluded that "[w]e now know, in a way almost unthinkable even a decade ago, that our system of criminal justice, for all its protections, is sufficiently fallible that innocent people are convicted of capital crimes with some frequency." Id. at 420. Accordingly, the Court stated its inclination to hold that there exists "an undue risk that a meaningful number of innocent persons, by being put to death before the emergence of the techniques or evidence that will establish their innocence, are thereby effectively deprived of the opportunity to prove their innocence — and thus deprived of the process that is reasonably due them in these circumstances under the Fifth Amendment." Id. at 418 (footnote omitted). At the end of its April 25, 2002 opinion, however, the Court refrained from issuing its final ruling, instead declaring that "prudence dictates that in a matter of such importance, the Court should give the Government — which only now has the benefit of the Court's views on the issue — one last opportunity to be heard before a final determination is reached." Id. at 420.
 
 
 12
 The Government filed an additional brief in the District Court, arguing that (1) the constitutionality of the death penalty was not ripe for adjudication prior to trial because, should the jury fail to convict the defendants or decline to impose the death penalty, no question of the FDPA's constitutionality would present itself; (2) the Supreme Court's decision in Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), which held that a claim of actual innocence based upon newly-discovered evidence is not a ground for federal habeas relief absent an allegation of some constitutional error, foreclosed the District Court's proposed holding; and (3) the District Court's proposed determination that a substantial number of innocent persons will be executed under the FDPA is wrong because (a) the defendants adduced no evidence that innocent people have been, or are likely to be, executed under the federal death penalty system, and (b) the advent of DNA testing has significantly reduced the risk of erroneous convictions in the future.
 
 
 13
 The District Court's final decision and order, entered on July 1, 2002, reaffirmed its preliminary views. Quinones II, 205 F.Supp.2d 256. As an initial matter, the Court concluded that the constitutional issue was ripe for review because "the pendency of the death penalty has immediate practical and legal consequences in this case that cannot be postponed." Id. at 258. In particular, it noted that (1) if the death penalty remains a possibility at the time of jury selection, "[u]nder prevailing Supreme Court precedent, any prospective juror strongly opposed to capital punishment must be excused for cause from sitting on [the] jury," id.; (2) "the very nature of the inquiries that must be made of prospective jurors ... will be radically different depending on whether or not the death penalty is involved, thereby affecting the jurors' entire view of the case," id.; and (3) "[i]n a death penalty case, the Government is guaranteed no fewer than 20 peremptory challenges, the same number as the defense, Rule 24(b), Fed. R.Crim.P.; in the absence of the death penalty, the Government has only six peremptory challenges, compared with 10 for the defense, ... [so that] in both absolute and relative terms, the Government has a considerably greater opportunity in a death penalty case to shape the jury to its preference than would otherwise be the case," id. (internal citation omitted). The District Court also noted that "the nature of the challenge to the death penalty here presented is essentially a facial challenge, so that the substantive arguments for and against the challenge will be the same at all stages of this proceeding." Id. Accordingly, it concluded that "the constitutionality of the death penalty on the ground here under consideration is not only `ripe' for adjudication at this time, it cannot be postponed without material prejudice to the defendants." Id. at 259.
 
 
 14
 With respect to the substantive issue, the Court acknowledged that, because the Due Process Clause itself mandates that no person "be deprived of life, liberty, or property without due process of law," U.S. Const. amend. V (emphasis added), the Framers of the Constitution necessarily "assume[d] the existence of the death penalty," Quinones II, 205 F.Supp.2d at 259.[3] Despite this acknowledgment, it held "that the Fifth Amendment's broad guarantee of `due process' must be interpreted in light of evolving standards of fairness and ordered liberty." Id. at 260. Applying this standard, it concluded that
 
 
 15
 the best available evidence indicates that, on the one hand, innocent people are sentenced to death with materially greater frequency than was previously supposed and that, on the other hand, convincing proof of their innocence often does not emerge until long after their convictions. It is therefore fully foreseeable that in enforcing the death penalty a meaningful number of innocent people will be executed who otherwise would eventually be able to prove their innocence. It follows that implementation of the Federal Death Penalty Act not only deprives innocent people of a significant opportunity to prove their innocence, and thereby violates procedural due process, but also creates an undue risk of executing innocent people, and thereby violates substantive due process.
 
 
 16
 Id. at 257.
 
 
 17
 The District Court also ruled that the Supreme Court's decision in Herrera does not preclude it from holding that the FDPA violates due process because a majority of Justices assumed in Herrera that "in a capital case a truly persuasive demonstration of `actual innocence' made after trial would render the execution of a defendant unconstitutional." Id. at 262 (quoting Herrera, 506 U.S. at 417, 113 S.Ct. 853). The District Court determined that "the Herrera Court's sole holding is that a belated or successive habeas petitioner must make a persuasive showing of actual innocence to warrant habeas relief. Thus, the Government's argument here that Herrera `forecloses' defendants' instant claim because they have not made a showing of `actual innocence' seriously misreads Herrera." Id. at 263 (internal citation omitted). The District Court also stated that "while the Government correctly notes that both the majority and dissenting opinions in Herrera briefly discuss the implications for the death penalty of the inherent fallibility of any system of justice, that discussion is not informed by the ground-breaking DNA testing and other exonerative evidence developed in the years since [Herrera was decided]." Id.
 
 
 18
 Finally, the District Court rejected the Government's challenge to the exoneration evidence on which its preliminary opinion relied. Id. at 264-68. First, it dismissed the Government's argument that the preliminary opinion erroneously relied only upon evidence of innocent persons sentenced to death in state courts. The District Court justified its reliance on state court data by reasoning that the number of defendants in the federal system is "too small, and the convictions too recent, to draw any conclusions therefrom" and that it was appropriate to extrapolate from the state-based evidence because "there is no logical reason to suppose that practices and procedures under the [FDPA] will be materially more successful in preventing mistaken convictions than the deficient state procedures that have already been shown to be wanting." Id. at 266. The District Court also rejected the Government's contention that the availability of DNA testing could significantly decrease the number of innocent persons sentenced to death, reasoning that DNA testing is available in only a small number of cases. Id. at 264.
 
 
 19
 In conclusion, the District Court notably held that "the Federal Death Penalty Act, by cutting off the opportunity for exoneration, denies due process, and, indeed, is tantamount to foreseeable, state-sponsored murder of innocent human beings." Id. at 268 (emphasis added). Accordingly, it granted the defendants' motions to strike all death penalty aspects from the case on the ground that the FDPA is unconstitutional. Id.
 
 
 20
 The Government timely filed notices of appeal on July 9, 2002.
 
 II.
 A. Appellate Jurisdiction
 
 21
 As an initial matter, we must determine whether we have jurisdiction to entertain this appeal. The Criminal Appeals Act, 18 U.S.C. § 3731, permits the United States to file appeals in a criminal case in certain enumerated circumstances.[4] Although this provision does not expressly permit the Government to appeal a district court order striking a death penalty notice, § 3731 itself states that "[t]he provisions of this section shall be liberally construed to effectuate its purposes." In United States v. Wilson, 420 U.S. 332, 337, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), the Supreme Court held that, in enacting § 3731, "Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit"; in a broad interpretation of § 3731, the Court held that, under that statute, orders in criminal cases are "appealable unless the appeal is barred by the Constitution," id. at 339, 95 S.Ct. 1013.
 
 
 22
 Based upon Wilson, four other circuits have found jurisdiction to entertain appeals by the Government where a district court has stricken a death penalty notice. See United States v. Bass, 266 F.3d 532, 535-36 (6th Cir.2001), rev'd on other grounds, 536 U.S. 862, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002); United States v. Acosta-Martinez, 252 F.3d 13, 16-17 (1st Cir. 2001); United States v. Cheely, 36 F.3d 1439, 1441 (9th Cir.1994); United States v. Woolard, 981 F.2d 756, 757 (5th Cir.1993). We agree with our sister circuits that, in light of the Supreme Court's holding in Wilson, we have jurisdiction to entertain this appeal under § 3731.
 
 B. Ripeness
 
 23
 The District Court held that the constitutionality of the FDPA was ripe for adjudication even though the defendants had not yet been tried, let alone convicted or sentenced to death. Both parties now agree: Although the Government argued in the District Court that the issue was not ripe for consideration, it expressly states in its appellate brief that it "has not appealed this aspect of the District Court's ruling," Govt. Br. at 13 n*, and it reiterated at oral argument that, although "[w]e contended below that [the issue] was not ripe for adjudication[,][w]e've decided not to press that [argument on] appeal ... [because] the district court's decision did not rely in any way on anything that might happen at trial." But the ripeness doctrine stems, at least in part, from limitations placed on judicial power by Article III of the Constitution,[5] and, accordingly, we have a duty to consider the issue nostra sponte. See, e.g., Nutritional Health Alliance v. Shalala, 144 F.3d 220, 225 (2d Cir.1998) ("Ripeness is a constitutional prerequisite to the exercise of jurisdiction by the federal courts. The Court, therefore, can raise the issue sua sponte." (internal citations omitted)); Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir.1998) ("Because the ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction, the court can raise it sua sponte, and, indeed, can do so for the first time on appeal." (internal quotation marks omitted)); see also Poland v. Stewart, 117 F.3d 1094, 1104 (9th Cir.1997) ("An appellate court has a duty to consider sua sponte whether an issue is ripe for review, in order to ensure that proper subject matter jurisdiction exists to hear the case."); Cheffer v. Reno, 55 F.3d 1517, 1523 (11th Cir.1995) (holding that, even though "[n]either party raises the issue of ripeness[,]" it must be addressed because courts "do not have subject matter jurisdiction to address unripe claims").
 
 
 24
 The Supreme Court has held that the ripeness doctrine protects against "judicial interference until a[ ] ... decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); see also Thomas, 143 F.3d at 34 (quoting Abbott Laboratories). In order to determine whether an issue is ripe for adjudication, we must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. 1507.
 
 
 25
 It is true that constitutional challenges by defendants to a particular punishment "are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." Cheffer, 55 F.3d at 1523 (emphasis added). But, in addressing any and all ripeness challenges, courts are required to make a fact-specific determination as to whether a particular challenge is ripe by deciding whether (1) the issues are fit for judicial consideration, and (2) withholding of consideration will cause substantial hardship to the parties. Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. 1507.
 
 
 26
 Applying this standard, the District Court concluded that the constitutional challenge in this case was ripe because (1) the issue was purely legal and, therefore, fit for judicial review and (2) resolution of the constitutional issue at this point in the proceedings was necessary to prevent the defendants from suffering hardship. To justify the second ground for its decision, the Court noted a number of procedural differences between capital and non-capital cases. First, it observed that, if the death penalty notices were not stricken before trial, "any prospective juror strongly opposed to capital punishment must be excused for cause .... [t]he result [of which] is to exclude from the jury a significant class of people who would be perfectly fit to serve if the death penalty were absent from the case." Quinones II, 205 F.Supp.2d at 258. The District Court also found that "the very nature of the inquiries that must be made of prospective jurors, both in pre-trial questionnaires and in voir dire at the time the jury is chosen, will be radically different depending on whether or not the death penalty is involved...." Id. Finally, the Court observed that, in a death penalty case, the Government is guaranteed at least twenty peremptory challenges — the same number as the defense — whereas, in the absence of the death penalty, the Government is afforded only six peremptory challenges and the defendants receive ten. Id.
 
 
 27
 "As a conclusion of law, a determination that an issue is [ ] ripe is reviewed de novo." United States v. Broadcast Music, Inc., 275 F.3d 168, 178 (2d Cir.2001). We agree with the District Court that the question presented was ripe for decision. Indeed, it seems to us that due regard for the rights of criminal defendants compels the conclusion that, in the circumstances presented, the defendants' constitutional challenge to the FDPA was ripe for consideration by the District Court and is ripe for our review. First, the defendants' argument clearly was fit for adjudication. A challenge to the facial constitutionality of a criminal statute is a pure question of law. And, as we observed in Nutritional Health Alliance, "a purely legal question ... is eminently fit for judicial review." 144 F.3d at 227; cf. Fed.R.Crim.P. 12(b) ("Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion.").
 
 
 28
 The District Court also properly concluded that a defendant suffers practical and legally-cognizable disadvantages by postponing a facial challenge to the death penalty until after trial. Quite apart from a defendant's obvious desire to know in advance whether he will be risking his life by going to trial, the District Court determined that a defendant may reasonably prefer the ordinary allocation of peremptory challenges — six for the government, ten for the defense — rather than the allocation in a capital case of twenty for each side. We also agree with the District Court that a defendant may reasonably prefer a jury on which persons who are conscientiously opposed to the death penalty are not excused for cause.
 
 
 29
 Further, if the death penalty remains a possibility during trial, a defendant may be forced into trial tactics that are designed to avoid the death penalty but that have the consequence of making conviction more likely. Moreover, the possibility of capital punishment frequently induces defendants to enter into plea agreements in order to guarantee their own survival. And the Supreme Court has specifically held that "a plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty." Brady v. United States, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Accordingly, to the extent that a defendant might be disposed to plead guilty before trial in order to avoid capital punishment, withholding consideration of a facial challenge to the death penalty until after trial, conviction and sentence could cause him substantial hardship.[6]
 
 
 30
 Finally, it is noteworthy that we have previously considered purely legal challenges to criminal statutes raised during the pre-trial stage of a prosecution even though the defendants had not yet been — and might never have been — convicted of violating the challenged statute. See, e.g., United States v. King, 276 F.3d 109 (2d Cir.2002) (reversing on the merits the district court's pre-trial dismissal of the indictment as a result of its determination that the Child Support Recovery Act of 1992, 18 U.S.C. § 228(a), is unconstitutional); United States v. Sitka, 845 F.2d 43 (2d Cir.1988) (affirming on the merits the district court's denial of a pre-trial motion to dismiss an indictment for tax fraud based on the argument that the Sixteenth Amendment to the Constitution — which gives Congress the "power to lay and collect taxes on incomes" — was never properly ratified). Although in this case the defendants challenge the constitutionality of their potential sentences rather than their potential convictions, this distinction is rendered irrelevant by the fact that the requirements of the FDPA necessarily affect the entire trial process, not merely the sentencing stage of the proceedings.
 
 
 31
 For all of these reasons, we hold that, were the defendants' facial challenge to the FDPA meritorious, the defendants would clearly have suffered hardship if the District Court had declined to address their challenge before trial or, indeed, if we ourselves declined to consider the merits of their substantive constitutional claim at this juncture. Because both of the factors for ripeness set forth by the Supreme Court in Abbott Laboratories were present when the District Court considered the constitutionality of the FDPA, the defendants' constitutional challenge to the FDPA was ripe for consideration by the District Court and is now ripe for our review.[7]
 
 
 32
 C. Constitutionality of the Federal Death Penalty Act
 
 
 33
 The District Court held that the FDPA is facially unconstitutional.[8] Questions of constitutional interpretation are reviewed de novo. See, e.g., United States v. King, 276 F.3d 109, 111(2d Cir.2002) ("The district court's dismissal of the indictment raises questions of constitutional interpretation, and thus we review the district court's decision de novo."); United States v. Cruz-Flores, 56 F.3d 461, 463 (2d Cir.1995) ("We review the district court's application of constitutional due process standards de novo.").
 
 
 34
 In holding that the FDPA violates the Constitution, the District Court relied upon the Due Process Clause of the Fifth Amendment.[9] But three separate provisions in the Fifth Amendment — including the Due Process Clause itself — expressly contemplate the existence of capital punishment:
 
 
 35
 No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ... nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb ... nor be deprived of life, liberty, or property without due process of law....
 
 
 36
 U.S. Const. amend. V (emphasis added). Accordingly, "it is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers." Gregg v. Georgia, 428 U.S. 153, 177, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).
 
 
 37
 While admitting that the Framers "assume[d] the existence" of the death penalty, Quinones II, 205 F.Supp.2d at 259, the District Court declared that "it is settled law that the Fifth Amendment's broad guarantee of `due process' must be interpreted in light of evolving standards of fairness and ordered liberty," id. at 260. Applying this standard, it found that the death penalty no longer comports with due process of law because of recent evidence demonstrating the frequency with which innocent people are convicted and sentenced to death.
 
 
 38
 The District Court erred in looking to "evolving standards" in conducting its due process analysis: It is the Eighth Amendment — not the Due Process Clause of the Fifth Amendment — that requires consideration of "evolving standards" in determining whether a particular punishment conforms to principles of decency "that mark the progress of a maturing society." Hudson v. McMillian, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoting Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)) (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)); see also Gregg, 428 U.S. at 173, 96 S.Ct. 2909 (quoting Trop, 356 U.S. at 101, 78 S.Ct. 590). And the Supreme Court expressly held in Gregg that, to the extent our standards of decency have evolved since the enactment of the Constitution, they still permit punishment by death for certain heinous crimes such as murder. Id. at 186-87, 96 S.Ct. 2909.[10]
 
 
 39
 While the Supreme Court has held that "the concept of due process of law is not final and fixed," Rochin v. California, 342 U.S. 165, 170, 72 S.Ct. 205, 96 L.Ed. 183 (1952), it has also made it clear that a criminal law violates the constitutional command of the Due Process Clause only if it offends some principle of justice "so rooted in the traditions and conscience of our people as to be ranked as fundamental." Id. at 169, 72 S.Ct. 205 (internal quotation marks and citation omitted); see also, e.g., Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); Medina v. California, 505 U.S. 437, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992); Schad v. Arizona, 501 U.S. 624, 642, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); United States v. Salerno, 481 U.S. 739, 751, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); Patterson v. New York, 432 U.S. 197, 201-02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), overruled on other grounds by Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). While the District Court failed to mention this standard expressly, it held that an innocent person sentenced to death has a liberty interest in the opportunity to seek exoneration during the course of his or her natural life and implied that this liberty interest amounts to a fundamental right. Quinones II, 205 F.Supp.2d at 261, 268 (recognizing "the right of an innocent person not to be deprived, by execution, of the opportunity to demonstrate his innocence" and holding that "the Federal Death Penalty Act, by cutting off the opportunity for exoneration, denies due process...").
 
 
 40
 Despite suggestions by the District Court and the defendants that they are embracing a novel challenge to the constitutionality of capital punishment, the idea that a convicted person has a right to the continued opportunity for exoneration during the course of his natural life is not new: Because this proposition has been presented to the Supreme Court on a number of occasions and repeatedly rejected by the Court, we hold that the continued opportunity to exonerate oneself throughout the natural course of one's life is not a right "so rooted in the traditions and conscience of our people as to be ranked as fundamental." Rochin, 342 U.S. at 171-72, 72 S.Ct. 205.
 
 
 41
 "Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice," Montana v. Egelhoff, 518 U.S. 37, 43-44, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion) (citing Medina, 505 U.S. at 446, 112 S.Ct. 2572). The majority of states as well as the federal government have provided for capital punishment for over two hundred years.[11] The defendants try to belittle the significance of this fact by arguing that courts have never before considered "the constitutional implications of the execution of innocent defendants in light of new evidence that this is a problem of crisis proportions." Defendants' Br. at 15. But the argument that innocent people may be executed — in small or large numbers — is not new; it has been central to the centuries-old debate over both the wisdom and the constitutionality of capital punishment, and binding precedents of the Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent.
 
 
 42
 Even before the founding of our country, European nations from which we derived our laws recognized that capital punishment inherently entails a risk that innocent people will be executed. See generally Hugo Adam Bedau & Michael L. Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L.Rev. 21, 22 (1987). In the mid-1770s, the British scholar Jeremy Bentham argued that capital punishment differs from all other punishments because "[f]or death, there is no remedy." Jeremy Bentham, The Rationale of Punishment 186 (Robert Hewarded., 1830) (circa 1775). Bentham recognized that there could be no "system of penal procedure which could insure the Judge from being misled by false evidence or the fallibility of his own judgment," id. at 187, and he argued that execution prevents "the oppressed [from meeting] with some fortunate event by which his innocence may be proved," id. at 189.
 
 
 43
 In the United States, opponents of capital punishment "began to argue that innocent people were often executed by mistake" as early as the mid-Nineteenth Century. Stuart Banner, The Death Penalty: An American History 121 (2002). These abolitionists maintained that "[the] government ought to abandon capital punishment in general because so many innocent people were going to their deaths on the gallows." Id. at 121-22. Since that time, there has been a prodigious scholarly debate over whether the likelihood that innocent people will be executed justifies abolition of the death penalty. See, e.g., Edwin M. Borchard, Convicting the Innocent: Errors of Criminal Justice Intro., passim (1932) (chronicling sixty-five prosecutions and convictions of "completely innocent people," id. at xiii, and noting that, although exactly "[h]ow many wrongfully convicted persons have actually been executed... is impossible to say ... these cases offer a convincing argument for the abolition of the death penalty," id. at xix); E. Roy Calvert, Capital Punishment in the Twentieth Century 123-134 (5th red. Patterson Smith 1973) (1936) (arguing that "no human tribunal is ever competent to impose an irrevocable penalty," id. at 123, and noting that "it is surprising how many cases are actually known of the execution of the innocent" given that, "[b]y the infliction of the capital penalty the person primarily concerned is prevented from urging his claim," id. at 125-26); George R. Scott, The History of Capital Punishment 248-63 (1950) (chronicling cases in which innocent persons have been executed and insisting that "we have no means of knowing whether or not other persons have been wrongly convicted and executed [because] .... [t]he accused is dead and, therefore, unable to supply information and evidence which may be necessary [for his or her exoneration,]" id. at 251-52); Jerome & Barbara Frank, Not Guilty 248-49 (1957) (noting "the intolerably monstrous nature of any death sentence ... [because] [i]t cannot be undone" and insisting that "[n]o one knows how many innocent men, erroneously convicted of murder, have been put to death by American governments [because].... once a convicted man is dead, all interest in vindicating him usually evaporates"); Charles L. Black, Jr., Capital Punishment: The Inevitability of Caprice and Mistake passim (1974) (arguing that the death penalty, no matter how it is administered, inherently encounters the possibility of mistake in its application); Hugo Adam Bedau & Michael L. Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L.Rev. 21 (1987) (citing their own study for the proposition that, from 1900 through 1985, at least 139 innocent persons were sentenced to death and at least 23 innocent persons were executed).[12]
 
 
 44
 Further, prior to the FDPA's enactment, Congress had been presented with extensive evidence in support of the argument that innocent individuals might be executed. See, e.g., 140 Cong. Rec. S10394-02 (Aug. 2, 1994) (Statement of Sen. Simon) (discussing generally "False Convictions and the Death Penalty" and placing on the record a 1994 USA Today article that noted "at least 85 instances in the past 20 years in which prosecutors — knowingly or unknowingly — relied on fabricated, mishandled, or tampered evidence to convict the innocent or free the guilty" and suggesting that "such miscarriages of justice are more common than we might like to believe"); 140 Cong. Rec. H2322-02, *H2330 (April 14, 1994) (Statement of Rep. Nadler) ("The death penalty, once imposed, can never be recalled.... We have no way of judging how many innocent persons have been executed, but we can be certain that there were some."); id. at *H2327 (Statement of Rep. Mfume) ("a large body of evidence shows that innocent people are often convicted of crimes, including capital crimes, and that some of them have been executed. There have been, on the average, more than four cases per year in which an entirely innocent person was convicted of murder, and many of those persons were sentenced to death."); id. at *H2326 (April 14, 1994) (Statement of Rep. Kopetski) ("Stanford Law Review documented hundreds of cases in which innocent individuals were sentenced to death, 23 of whom were wrongly executed. Let me repeat that, because it's a staggering number: 23 people lay dead who were later exonerated of wrongdoing."); 139 Cong. Rec. S15745-01, *S15766 (Nov. 16, 1993) (Statement of Sen. Levin) (noting "case after case after case in which people have been sentenced to death only later to be found innocent and released" and placing on the record an October 21, 1993 study by the Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee that "describes 48 cases in the past 20 years where a convicted person has been released from death row either because their innocence was proven or because there was a reasonable doubt that was raised as to their guilt"). While not determinative, it is noteworthy that Congress enacted the FDPA against the backdrop of repeated assertions by some members that innocent people have been executed. This informed, deliberative legislative action itself casts doubt on the assertion that the right to a continued opportunity for exoneration throughout the course of one's natural life is "rooted in the ... conscience of our people."
 
 
 45
 Most importantly, the Supreme Court has upheld state and federal statutes providing for capital punishment for over two hundred years, and it has done so despite a clear recognition of the possibility that, because our judicial system — indeed, any judicial system — is fallible, innocent people might be executed and, therefore, lose any opportunity for exoneration.
 
 
 46
 Since 1878, the Supreme Court has upheld challenges to death penalty statutes based upon the Due Process Clause as well as the Eighth Amendment. See, e.g., Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878) (holding that execution by shooting as punishment for the crime of murder does not violate the Eighth Amendment's prohibition against cruel and unusual punishment); In re Kemmler, 136 U.S. 436, 449, 10 S.Ct. 930, 34 L.Ed. 519 (1890) (holding that punishment of death by electrocution does not violate the Due Process Clause of the Fourteenth Amendment which, like the Due Process Clause of the Fifth Amendment, "requires that no different or higher punishment shall be imposed upon one than is imposed upon all for like offenses .... [b]ut [] was not designed to interfere with the power of the State to protect the lives, liberties, and property of its citizens"); State of Louisiana ex rel Francis v. Resweber, 329 U.S. 459, 470, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring) (rejecting a petitioner's claim that Louisiana's second attempt at executing him where the first attempt had failed violates due process because multiple attempts at execution do not "offend[ ] a principle of justice `[r]ooted in the traditions and conscience of our people'").[13]
 
 
 47
 The Supreme Court first expressly acknowledged the argument pressed here — namely, that capital punishment might deprive innocent persons of the ability to exonerate themselves — in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In Furman, all nine Justices, each writing separately, found that application of a particular state death penalty statute was so arbitrary that it violated the Eighth Amendment. Despite this, only two members of the Court — Justice Thurgood Marshall and Justice William J. Brennan — were willing to hold the death penalty unconstitutional per se. Id. at 305, 358-59, 92 S.Ct. 2726. And, although the argument before us today was squarely before the Court in Furman, only Justice Marshall indicated any possibility that this argument, standing alone, might be sufficient to render the death penalty unconstitutional. See post, note 14.
 
 
 48
 The opinions of Justice Marshall and Justice Brennan make clear that the Furman Court was presented with, considered, and declined to adopt the argument that capital punishment unconstitutionally deprives innocent persons who have been sentenced to death of the opportunity to exonerate themselves. In his opinion, Justice Marshall expressly recognized that "there is evidence that innocent people have been executed before their innocence can be proved." 408 U.S. at 364, 92 S.Ct. 2726 (Marshall, J., concurring):
 
 
 49
 Just as Americans know little about who is executed and why, they are unaware of the potential dangers of executing an innocent man. Our `beyond a reasonable doubt' burden of proof in criminal cases is intended to protect the innocent, but we know it is not foolproof. Various studies have shown that people whose innocence is later convincingly established are convicted and sentenced to death.
 
 
 50
 ....
 
 
 51
 No matter how careful courts are, the possibility of perjured testimony, mistaken honest testimony, and human error remain all too real. We have no way of judging how many innocent persons have been executed but we can be certain that there were some.
 
 
 52
 Id. at 366-68, 92 S.Ct. 2726 (footnotes omitted).
 
 
 53
 Justice Brennan took the argument one step further, expressly acknowledging that execution deprives innocent persons of the opportunity for exoneration:
 
 
 54
 [d]eath is truly an awesome punishment. The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. The contrast with the plight of a person punished by imprisonment is evident. An individual in prison does not lose `the right to have rights.' A prisoner retains, for example, the constitutional rights to the free exercise of religion, to be free of cruel and unusual punishments, and to treatment as a `person' for purposes of due process of law and the equal protection of the laws. A prisoner remains a member of the human family. Moreover, he retains the right of access to the courts. His punishment is not irrevocable. Apart from the common charge, grounded upon the recognition of human fallibility, that the punishment of death must inevitably be inflicted upon innocent men, we know that death has been the lot of men whose convictions were unconstitutionally secured in view of later, retroactively applied, holdings of this Court. The punishment itself may have been unconstitutionally inflicted, yet the finality of death precludes relief. An executed person has indeed `lost the right to have rights.'
 
 
 55
 408 U.S. at 290, 92 S.Ct. 2726 (internal citation omitted) (emphasis added).[14]
 
 
 56
 These excerpts demonstrate beyond any possible doubt that the basic thesis of the District Court's opinion — that capital punishment is unconstitutional because it denies individuals the opportunity for exoneration — is not a new one. The Furman Court understood that innocent persons may be executed before obtaining evidence necessary to exonerate themselves. Nevertheless, seven justices declined to find that "the death penalty is unconstitutional per se." 408 U.S. at 311, 92 S.Ct. 2726 (White, J., concurring). In doing so, they effectively denied the existence of a fundamental right to the opportunity for exoneration over the course of one's natural life.
 
 
 57
 More importantly, just four years after Furman, the Court expressly held in Gregg v. Georgia that capital punishment does not constitute a per se violation of the Eighth Amendment. 428 U.S. at 207, 96 S.Ct. 2909, The Court reached this conclusion despite the petitioner's argument that the death penalty "entail[s] both mistake and caprice," and that "some people will be killed wrongly," Br. for Petitioner in Gregg at 10a, and despite its own acknowledgment that "[t]here is no question that death as a punishment is unique in its severity and irrevocability." 428 U.S. at 187, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.) (citing Furman, 408 U.S. at 286-291, 92 S.Ct. 2726 (Brennan, J., concurring); id., at 306, 92 S.Ct. 2726 (Stewart, J., concurring)). Moreover, in his dissent in Gregg, Justice Brennan reiterated his view that the death penalty is excessive because "[a]n executed person has indeed `lost the right to have rights.'" 428 U.S. at 230, 96 S.Ct. 2971 (quoting Furman, 408 U.S. at 290, 92 S.Ct. 2726 (Brennan, J., concurring)). The Gregg Court was therefore keenly aware of the argument asserted here, that execution terminates any asserted right to the opportunity for exoneration during one's natural life. Despite this awareness, the Court rejected the proposition that capital punishment is unconstitutional per se.
 
 
 58
 More recently, in Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court affirmed the denial of a petition for a writ of habeas corpus in which the petitioner claimed that his execution would violate both the Due Process Clause and the Eighth Amendment because new evidence could prove his "actual innocence."[15] The Court noted that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Id. at 400, 113 S.Ct. 853 (emphasis added). The Court then declined to hold that "execution of a person who is innocent of the crime for which he was convicted" amounts to an independent violation of either the Eighth Amendment or the Due Process Clause. Id. at 398, 113 S.Ct. 853. The Court noted that "[t]his proposition has an element of appeal, as would the similar proposition that the Constitution prohibits the imprisonment of one who is innocent of the crime for which he was convicted ...." Id. But the Court recognized that it had previously "observed that `[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'" Id. at 398-99, 113 S.Ct. 853 (quoting Patterson v. New York, 432 U.S. 197, 208, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)).
 
 
 59
 The Herrera Court recognized that "a petitioner otherwise subject to defenses of abusive or successive use of the writ may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence." Id. at 404, 113 S.Ct. 853. It emphasized, however, that "our habeas jurisprudence [thus far] makes clear that a claim of `actual innocence' is not itself a constitutional claim....'" Id. (emphasis added).
 
 
 60
 Despite this precedent, the Herrera Court "assume[d], for the sake of argument in deciding [that] case, that in a capital case a truly persuasive demonstration of `actual innocence' made after trial would render the execution of a defendant unconstitutional ...." id. at 417, 113 S.Ct. 853 (emphasis added). But, while the Court assumed, only for the sake of its analysis, that capital punishment of a person who is able to demonstrate his innocence prior to execution violates the Constitution, it made no such holding. It follows, therefore, that Herrera did not suggest, much less hold, that the mere speculative possibility that one might be able to demonstrate his innocence at some point in the future renders capital punishment unconstitutional.
 
 
 61
 Moreover, the Herrera Court made clear that, even if the Constitution did protect innocent persons from execution, "the threshold showing for such an assumed right would necessarily be extraordinarily high." Id.[16] Similarly, in his concurrence, Justice White expressed the view that, for an innocent person to be entitled to relief, he "would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could [find] proof of guilt beyond a reasonable doubt." Id. at 429, 113 S.Ct. 853 (internal quotation marks omitted). And even the three dissenters in Herrera, who maintained that execution of actually innocent individuals violates both the Eighth Amendment and the Due Process Clause, id. at 430, 113 S.Ct. 853, "would hold that, to obtain relief on a claim of actual innocence, the petitioner must show that he probably is innocent." Id. at 442, 113 S.Ct. 853 (Blackmun, J., dissenting).[17] Herrera therefore establishes, at a minimum, that it is lawful under the Due Process Clause to end the judicial review process at some point, despite the purely theoretical possibility that the defendant might have been able to demonstrate his innocence in the future.
 
 
 62
 Further, despite its recognition of the "unalterable fact that our judicial system, like the human beings who administer it, is fallible," id. at 415, 113 S.Ct. 853, the Court held in Herrera that a state's refusal to grant a new trial to a capital defendant based upon newly-discovered evidence that could prove his innocence does not "transgress[] a principle of fundamental fairness rooted in the traditions and conscience of our people," id. at 411, 113 S.Ct. 853 (internal quotation marks omitted). The Supreme Court thereby made clear that, once an individual has exhausted his available legal remedies, the Due Process Clause no longer entitles him to an opportunity to demonstrate his innocence. Accordingly, the Supreme Court established in Herrera that there is no fundamental right to the opportunity for exoneration even before one's execution date, much less during the entire course of one's natural lifetime.
 
 
 63
 The District Court found the Supreme Court's decision in Herrera to be inapposite because it was "not informed by the ground-breaking DNA testing and other exonerative evidence developed in the years since." Quinones II, 205 F.Supp.2d at 263. Yet, Herrera prevents us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent. And the Supreme Court has expressly mandated that "[i]f a precedent of this Court has direct application in a case... the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); see also Agostini v. Felton, 521 U.S. 203, 238, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (holding that lower courts must follow Supreme Court case law "unless and until this Court reinterpret[s] the binding precedent"). Accordingly, in light of Herrera, the District Court erred in recognizing a "[fundamental] right of an innocent person not to be deprived, by execution, of the opportunity to demonstrate his innocence," Quinones II, 205 F.Supp.2d at 261, and we likewise would err if we were to ignore or reject the jurisprudence of the Supreme Court on this subject.
 
 
 64
 In sum, if the well-settled law on this issue is to change, that is a change that only the Supreme Court or Congress is authorized to make.
 
 
 65
 * * *
 
 
 66
 Even if there were no Supreme Court precedent specifically rejecting the idea of a fundamental right to the opportunity for exoneration during the course of one's natural life, the Supreme Court's decision in Chapman v. United States, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), precludes us from holding that the FDPA violates due process. In Chapman, the Court held that, under the Due Process Clause
 
 
 67
 [e]very person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. But a person who has been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment.
 
 
 68
 500 U.S. at 465, 111 S.Ct. 1919 (internal citations omitted); see also United States v. Inglesi, 988 F.2d 500, 503 (4th Cir.1993) (quoting Chapman, 500 U.S. at 465, 111 S.Ct. 1919, for the proposition that "the relevant due process inquiry on [a constitutional challenge in the sentencing context] is only whether the sentence at issue is `based on an arbitrary distinction,' or, instead, on `a rational sentencing scheme'"); cf. In re Kemmler, 136 U.S. 436, 449, 10 S.Ct. 930, 34 L.Ed. 519 (1890) (holding that, in the context of capital punishment, the Due Process Clause "requires that no different or higher punishment shall be imposed upon one than is imposed upon all for like offenses. But it was not designed to interfere with the power of the State to protect the lives, liberties and property of its citizens"). The Supreme Court expressly held in Gregg that the death penalty does not violate per se the Eighth Amendment's prohibition of cruel and unusual punishment, and the defendants in the instant case do not allege on appeal that the FDPA makes arbitrary distinctions or is being arbitrarily applied. Accordingly, under the standard articulated by the Supreme Court in Chapman, capital punishment cannot constitute a per se violation of the Due Process Clause.[18]
 
 CONCLUSION
 
 69
 In sum, we hold that (1) we have jurisdiction to entertain this appeal, (2) the constitutional challenge was ripe for consideration prior to trial, (3) to the extent the defendants claim relies upon the Eighth Amendment, it is foreclosed by the Supreme Court's decision in Gregg v. Georgia, and (4) the FDPA does not violate the Due Process Clause of the Fifth Amendment.
 
 
 70
 Accordingly, we reverse the April 25, 2002 order of the District Court and remand the cause for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 On August 22, 2002, the grand jury returned a further superseding indictment that added no new charges or defendants but, instead, set forth the statutory aggravating factors that, pursuant toRing v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), must now be alleged in the indictment and found by a jury in capital cases.
 
 
 [2]
 The Court also noted that there have been at least twenty additional capital defendants exonerated in the past decade on grounds other than DNA evidenceId. at 418.
 
 
 [3]
 In fact, the Fifth Amendment makes three separate references to capital punishment:
 No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ...; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; ... nor be deprived of life, liberty, or property without due process of law....
 U.S. Const. amend. V (emphasis added).
 
 
 [4]
 18 U.S.C. § 3731 provides:
 In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.
 An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.
 An appeal by the United States shall lie to a court of appeals from a decision or order, entered by a district court of the United States, granting the release of a person charged with or convicted of an offense, or denying a motion for revocation of, or modification of the conditions of, a decision or order granting release.
 The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.
 The provisions of this section shall be liberally construed to effectuate its purposes.
 
 
 [5]
 Article III declares that "the judicial Power shall extend to all Cases ... [or] Controversies...." U.S. Const. art. III, § 2. We have held that "[t]he purpose of the ripeness requirement is to ensure that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III of the U.S. Constitution" by "prevent[ing] a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur...."Dougherty v. Town of North Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d Cir. 2002).
 
 
 [6]
 Although the Supreme Court held inBrady, 397 U.S. at 747, 90 S.Ct. 1463, that a guilty plea induced by fear of possible death does not necessarily violate the Due Process Clause of the Fifth Amendment, the dilemma that gives rise to such plea agreements clearly constitutes a cognizable harm stemming from the possibility of capital punishment.
 
 
 [7]
 We recognize that the Supreme Court has upheld convictions imposed by improperly death-qualified juriesSee Buchanan v. Kentucky, 483 U.S. 402, 414-20, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987) (holding that a defendant who was not subject to the death penalty suffered no Sixth Amendment violation when his guilt was decided by a jury that had been death-qualified); Witherspoon v. Illinois, 391 U.S. 510, 516-18, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (upholding a conviction despite holding that imposition of the death penalty would be unconstitutional because the state's procedures for empaneling a death-qualified jury violated the Sixth Amendment). But these cases stand for the proposition that a defendant does not suffer constitutional harm as a result of having been convicted by a jury that was unnecessarily or illegally death-qualified. They do not hold that defendants suffer no cognizable hardship in such circumstances. Accordingly, these cases are not relevant to, let alone dispositive of, the ripeness issue presented by this appeal.
 
 
 [8]
 InUnited States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Supreme Court stated that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." A plurality of the Supreme Court has recently indicated that the standard for mounting a facial challenge is not as severe as Salerno had suggested. City of Chicago v. Morales, 527 U.S. 41, 55-56 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). But the defendants argue that capital punishment is inherently unconstitutional and, therefore, no set of circumstances exist under which the FDPA would be valid. Accordingly, even under the demanding test of Salerno, the defendants have properly mounted a facial challenge to the constitutionality of the FDPA.
 
 
 [9]
 In its final opinion and order, the District Court held that the FDPA violates both substantive and procedural due processQuinones II, 205 F.Supp.2d at 257. But the defendants argue, and the District Court held, that the constitutional error lies in the act of execution itself, not the procedures set forth in the FDPA. Accordingly, the claim is properly framed as one of substantive due process. Cf. State v. Bull, 185 Ill.2d 179, 235 Ill.Dec. 641, 705 N.E.2d 824, 841-43 (1998) (finding that defendant's argument that "[n]o amount of procedural due process can prevent all of the errors that can result in an innocent person being convicted of a capital crime" amounts to "a mere attack on the death penalty per se" (internal quotation marks omitted)). Further, even if the defendants did state a procedural due process claim, we would not need to examine that claim independently because the Supreme Court has applied the same test when reviewing both substantive and procedural due process challenges to criminal laws. See, e.g., Medina v. California, 505 U.S. 437, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (holding that a criminal procedure does not violate due process unless "it offends some principle of justice so rooted in the traditions and consciousness of our people as to be ranked as fundamental" (internal quotation marks omitted)); Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (applying the same test to a substantive due process claim).
 
 
 [10]
 Despite the District Court's clear reliance on the Due Process Clause, the defendants assert that their claim is also based upon the Eighth Amendment. Br. for Defendants at 8-9. But to the extent their argument relies on the Eighth Amendment, it is foreclosed by the Supreme Court's holding in GreggSee Agostini v. Felton, 521 U.S. 203, 238, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (holding that lower courts must follow Supreme Court case law "unless and until this Court reinterpret[s] the binding precedent"); Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, ... the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").
 
 
 [11]
 While, as notedante, only the Eighth Amendment incorporates evolving standards of decency, and although the Supreme Court has declared that "contemporary practice ... [is] of limited relevance to the due process inquiry," Medina, 505 U.S. at 447, 112 S.Ct. 2572, we note that, as of 2000, thirty eight states as well as the federal government had capital statutes. United States Department of Justice, Bureau of Justice Statistics, at http://www.ojp.usdoj.gov/bjs/cp.htm (last visited on December 5, 2002).
 
 
 [12]
 The study by Bedau and Radelet has sparked a significant amount of scholarly controversy over the extent to which innocent persons are executedSee, e.g., Stephen J. Markman & Paul G. Cassell, Protecting the Innocent: A Response to the Bedau-Radelet Study, 41 Stan. L.Rev. 121 (1988).
 
 
 [13]
 InFrancis, Justice Frankfurter recognized that, unless capital punishment actually violates "a principle of justice `[r]ooted in the traditions and conscience of our people[,]'"
 this Court must abstain from interference with State action no matter how strong one's personal feeling of revulsion against a State's insistence on its pound of flesh. One must be on guard against finding in personal disapproval a reflection of more or less prevailing condemnation.... I cannot rid myself of the conviction that were I to hold that [execution violates] the Due Process Clause ... I would be enforcing my private view rather than that consensus of society's opinion which, for purposes of due process, is the standard enjoined by the Constitution.
 329 U.S. at 470-71, 67 S.Ct. 374 (Frankfurter, J., concurring).
 
 
 [14]
 It should be noted that, although Justice Brennan fully recognized that "the punishment of death must inevitably be inflicted upon innocent men" and that an executed person loses the right "to treatment as a `person' for purposes of due process of law," he declined to hold the death penalty unconstitutional "on that ground alone" because "death is a punishment of longstanding usage and acceptance in this country."Id. at 290-91, 92 S.Ct. 2726.
 
 
 [15]
 The petitioner was convicted of capital murder and sentenced to death in Texas state court, and his conviction and sentence were upheld on direct appeal and in collateral proceedings in the Texas state courts. 506 U.S. at 393, 113 S.Ct. 853. His "new evidence" claim was not cognizable in the Texas courts because Texas required that all new trial motions based on newly discovered evidence be filed within 30 days after sentence, and the habeas petition was filed ten years after the petitioner's conviction and sentenceId. at 400, 113 S.Ct. 853.
 
 
 [16]
 The District Court, seizing upon this language, attempted to distinguishHerrera by claiming that "the Herrera Court's sole holding is that a belated or successive habeas petitioner must make a persuasive showing of actual innocence to warrant habeas relief." Id. at 263 (internal citation omitted). But, as noted above, the Supreme Court held no such thing — it merely stated that, if a showing of actual innocence were sufficient to warrant habeas relief, then the threshold showing for such relief would necessarily be high. Further, the Court expressly stated in Herrera that "a claim of `actual innocence' is not itself a constitutional claim." Id. at 404. This language makes clear that the holding of Herrera is in no way limited to belated or successive habeas petitions.
 
 
 [17]
 The Supreme Court once again reiterated this high standard inSchlup v. Delo, where it stated that "a Herrera-type claim would have to fail unless the federal habeas court is itself convinced that [] new facts unquestionably establish [] innocence." 513 U.S. 298, 317, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).
 
 
 [18]
 Even before the Supreme Court's decision inChapman, Justice Marshall recognized in Furman that substantive due process rights afford limited protection in the context of punishment beyond the protection provided by the Eighth Amendment:
 The concepts of cruel and unusual punishment and substantive due process become so close as to merge when the substantive due process argument is stated in the following manner: because capital punishment deprives an individual of a fundamental right ... the State needs a compelling interest to justify it. Thus stated, the substantive due process argument reiterates what is essentially the primary purpose of the Cruel and Unusual Punishments Clause of the Eighth Amendment....
 408 U.S. at 358 n. 141, 92 S.Ct. 2726 (internal citation omitted). Following this logic, the defendants' claim in this case is clearly foreclosed by the Supreme Court's decision in Gregg v. Georgia.