IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-74,637





CARY D. KERR, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM TARRANT COUNTY




 Keller, P.J., delivered the opinion of the Court in which MEYERS, PRICE,
WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN JJ., joined. JOHNSON,
J., concurred in the result.


O P I N I O N



 Appellant was convicted in March 2003 of a capital murder (1) committed on or about July 12,
2001. Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal
Procedure art. 37.071, §§2(b) and 2(e), the trial judge sentenced appellant to death. (2) Direct appeal
to this Court is automatic. (3) Appellant raises six points of error. We will affirm.

I. SUFFICIENCY OF THE EVIDENCE


 In point of error one, appellant contends that the evidence is legally insufficient to support 
his conviction for the offense of capital murder. Specifically, he challenges the sufficiency of the
evidence to show the underlying offense of aggravated sexual assault. (4) He contends that the
evidence shows no more than a consensual sexual encounter. (5)

A. Background


 The victim in this case was Pamela Horton. Although another man was her boyfriend,
Horton had been seen at bars in appellant's company for about a month. On the evening of July 11,
2001, Horton socialized with Jennifer York and appellant at a bar called the Swan Club, and the
three later moved to a nearby nightclub called Cowtown. York briefly danced with appellant but 
when he grabbed her arm as she was walking away, she punched him. York did not like appellant
and told Horton so, but Horton defended him as being "a nice guy." 

 Horton later told York that she needed a ride home, but York was not yet ready to leave. 
Horton was clearly intoxicated. In her testimony, York characterized Horton as an "impatient"
person, who could be predicted to look for someone else to take her home immediately, rather than
wait until York was ready. Later, a bartender noticed Horton leaving with appellant. After escorting
Horton from the nightclub, appellant returned briefly and whispered to Cathy Dawson, "I'm taking
this drunk bitch home and I'll be right back." 

 At 2:00 a.m. on July 12, a taxicab driver spotted Horton's dead body, lying in the street. The
taxicab driver located an ambulance and notified the paramedics of the body's location. Horton was
wearing shorts but nothing else: no shirt, socks, shoes, or underwear. Only the top button of the
shorts's button-fly was fastened. There was "fuzz" on the victim's feet, indicating the victim had
recently worn socks.

 After the paramedics had wrapped the victim's body, appellant approached them and asked
them to pull back the sheet because he believed he could identify her. The paramedics responded
that they would not pull back the sheet but asked appellant to tell them who it was if he knew. 
Appellant stated that he was the one who found the body and had called them. The paramedics
responded that no one "called" them; they were on the scene because they had been approached by
a taxicab driver. Appellant then responded that he had flagged down the taxi. Appellant further
stated that he had not stopped his car upon discovering her body because he thought she might be 
a robbery decoy and that he had seen a black sedan with two male passengers parked nearby. 
Appellant also stated that he recognized the woman as someone who frequented bars in the area.

 Police officers arrived at the scene, secured it, and talked to appellant. The officers saw a
purse in appellant's car and asked whose purse it was. Appellant first stated it was the victim's and
then added, "If that's the girl I picked up, maybe it's hers." (6) He became very nervous after this
admission. Appellant retrieved the purse from his vehicle for the officers' inspection. A broken,
comb-like hair clip was attached to the handle of the purse. During their conversation with
appellant, the officers noticed a long strand of blonde hair on his face. Appellant did not have
blonde hair but the victim did. One of the officers took the strand of blonde hair. The officers later
arrested appellant at the scene. On the way to the police station, appellant started kicking the back
window of the patrol car and began "cussing" and saying he was going to get out of the car.

 The victim's body exhibited a large number of injuries, some of which were inflicted before
death, and some after death. Injuries to the victim while she was still alive included: bruising of the
right temple and the top of the right eye, a bruise on the top side of the left eye or eyelid, tiny
pinpoint bruises on the neck and the collarbone, a bruise on the chest above the right breast, and
bruises on the arms. Also, the hyoid bone of the neck was fractured. Post-mortem injuries included
abrasions on the trunk of the body, the front part of the breasts, the abdomen, the left arm, the right
leg, and the right foot. These post-mortem abrasions were "gliding abrasions" that could be found
on someone thrown out of a motor vehicle. It was determined that the victim also had semen in her
mouth. 

 According to the deputy medical examiner who performed the autopsy, the bruises on the
neck indicated that the cause of death was manual strangulation and that the death was a homicide. 
A forensic anthropologist testified that the broken hyoid bone was also a sign of manual
strangulation. The deputy medical examiner indicated that the injuries and sexual activity occurred
within a short time of each other, but he conceded in cross-examination that the physical condition
of the body was not inconsistent with consensual sexual activity followed by a homicide.

 DNA testing showed that the semen in the victim's mouth matched the defendant's DNA
profile. The probability of a match with another person was 1 in 21 trillion for Caucasians, 1 in 159
trillion for those of African descent, and 1 in 615 trillion for Southwestern Hispanics. Hair analysis
of the strand of blonde hair picked off appellant's face showed similarities to the victim's hair but
with enough differences that the hair examiner could say only that the strand could not be ruled out
as having come from the victim.

 The victim's blood alcohol concentration at the time of autopsy was determined to be 0.465
- over five times the legal limit. The deputy medical examiner estimated that the concentration
probably had peaked at 0.5 and was on its way down, and that the victim would have to have been
a "seasoned drinker" to be able walk around with that much alcohol in her body. 

 A search of appellant's home yielded a brassiere, panties, and a plastic "tooth" for a comb
or a hair clasp. The brassiere was severely torn in two places. In one place there was a complete
separation of the strap from the cups in the front, and in another place there was a tear on one of the
cups at the side. A forensic examiner testified that the tears were significant enough to interfere with
the brassiere's function, and he testified that a great deal of force would be required to produce the
tears in question. Examination of the comb-like hair clip revealed that it had been manufactured
with fourteen teeth but eight had broken off. In addition, part of the gripping surface was missing
and the hinging mechanism was damaged. The comb tooth retrieved from appellant's residence was
the same color as the hair clasp, and microscopic analysis showed a match. The forensic examiner
testified that considerable force would be needed to cause the observed damage to the hair clasp. 

 The brassiere and the panties contained DNA from the victim.

B. Analysis


 In conducting a legal sufficiency review, this Court examines all the evidence in the light
most favorable to the prosecution to determine whether any rational trier of fact could have found
the essential elements of the offense beyond a reasonable doubt. (7) The essential element the
defendant challenges is lack of consent for the underlying offense of aggravated sexual assault. He
focuses on the fact that he and the victim were acquaintances and that the physical condition of the
victim's body was not inconsistent with a consensual sexual encounter followed by a murder. 

 Nevertheless, the close proximity in time between the sexual activity and the murder is highly
suspicious. Covering up a sexual assault is a recognized motive for murder. (8) And there was no
evidence of any other motive for appellant to kill Horton. We have recognized that it is an "unlikely
supposition" that there exists a motive-less killer. (9) 

 There is also the evidence of the torn brassiere and Horton's injuries. Given the condition
of the brassiere and the condition of the victim's body, which included bruising on the chest above
one of the breasts, the jury could have rationally inferred that the brassiere was ripped and the bruises
were caused during a forced sexual encounter. 

 Further, appellant's description of the victim as a "drunk bitch" seems at variance with the
expected attitude of someone anticipating a consensual sexual encounter. Considering all of the
above factors, we conclude that the jury could have rationally found that the sexual activity occurred
without the victim's consent. Point of error one is overruled. 

II. INDICTMENT


 In point of error two, appellant contends that the indictment was fundamentally defective
because it did not allege the future dangerousness special issue submitted at the punishment stage
of trial. As authority for his contention, he relies primarily upon Apprendi v. New Jersey (10) and Ring
v. Arizona. (11) We have held that a capital murder indictment need not allege the punishment stage
special issues on which the State carries the burden of proof because a "defendant indicted for capital
murder is effectively put on notice that the special issues under Article 37.071 will be raised." (12) We
have specifically rejected the contention that Apprendi changes that conclusion. (13) We see nothing
in Ring to change that conclusion either. First, Ring did not purport to make any holding with regard
to what must be alleged by the State in an indictment. (14) Second, to the extent due process requires
notice of the issue, notice was adequately conveyed by the indictment for a capital offense. All
capital murder cases (except those in which the State has given notice that it will not seek the death
penalty) include the future dangerousness special issue, so an indictment for the crime necessarily
places the defendant on notice that the future dangerousness issue will be litigated. (15) Point of error
two is overruled. 

III. PUNISHMENT


A. Testimony about the prison system


 In point of error four, appellant contends that the trial court erred in admitting, at the
punishment stage, testimony from S.O. Woods, a former assistant director of TDCJ-CID, regarding
the operation of the prison system. Appellant does not set out the exact testimony of which he
complains, but he describes the general subject matter as follows:

Woods gave a general description of how the prison system worked and in particular
talked about how inmates are classified. Woods then offered testimony regarding
specifically how the applicant would be classified upon reception at IDTDCJ based
on a capital life sentence. Woods specifically testified regarding the presence of
weapons and violence in the penitentiary and regarding escapes from the penitentiary,
supra. 


Appellant claims that the testimony "was obviously intended to denigrate the ability of the
penitentiary system to control inmates and therefore devalue it in terms of representing a legitimate
sentencing alternative." He argues that the subject matter of the testimony is not within the scope
of the punishment issues and that the testimony denied him a particularized assessment of
punishment guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

 Appellant does not claim that he made an objection to this testimony, and our review of the
record fails to reveal any such objection. A timely objection is required to preserve error in the
admission of evidence. (16) Because he failed to object, appellant has procedurally defaulted his claim. 
Point of error four is overruled.

B. Ineffective assistance of counsel


 In point of error five, appellant contends that defense counsel rendered ineffective assistance
at the punishment stage by presenting testimony establishing that appellant was indeed a future
danger to society. Specifically, appellant faults defense counsel for presenting testimony from a
clinical psychologist that there is a two percent chance that appellant will commit an act of violence
while incarcerated. Appellant claims that two percent amounts to a probability and thus constitutes
proof beyond a reasonable doubt of the future dangerousness special issue.

 In closing argument, defense counsel cited the psychologist's testimony for the proposition
that the two percent chance of appellant committing violent acts was insignificant and did not
amount to a "probability":

But the other thing you need to consider is where Mr. Kerr's going is in a different
context. That was the purpose of Dr. Cunningham's testimony. Contrary to what we
might commonly believe, violent activity in the free world is not predictive of
violence in prison. Who says so. The government's own statistics say so. The
calculation for Mr. Kerr is two percent. Two percent. And I submit to you that's not
a probability.


To establish ineffective assistance of counsel, a defendant must meet the two-pronged deficient
performance/prejudice test set out in Strickland v. Washington. (17) In determining the deficient
performance prong, the reviewing court gives great deference to the decisions made by counsel. (18) 
We cannot conclude that counsel acted unreasonably in pursuing a trial strategy of convincing the
jurors that appellant did not pose a "probability" of violence because the chance of violence was only
two percent. Point of error five is overruled.

C. Constitutionality of the death penalty


 In point of error three, appellant contends that the Texas death penalty sentencing scheme
is unconstitutional because it fails to require that the jury be charged on the mitigation special issue
with the "beyond a reasonable doubt" burden of proof standard. He cites Apprendi and Ring in
support of this contention. We have previously decided this issue adversely to appellant's position. (19)

 In point of error six, appellant contends that the death penalty scheme is unconstitutional
because it leads the State to execute an unacceptable number of innocent defendants. He also
contends that evolving standards of decency require the courts to redetermine the constitutionality
of the death penalty. But he does not point to any particular Texas procedure that is defective, nor
does he provide any evidence that Texas has executed even a single innocent person. Rather, he cites
a New York federal district court's decision that was later reversed by the Second Circuit. (20)

 We have rejected a similar contention on the ground that the defendant did not claim that he
was innocent. (21) Although this appellant has advanced a point of error attacking the legal sufficiency
of the evidence to support guilt, we have rejected that contention, and he has not otherwise advanced
any reason to believe that he is innocent. Moreover, his argument would amount to holding that the
United States Constitution requires the death penalty to be completely abolished nationwide. We
have repeatedly upheld the constitutionality of the death penalty against numerous challenges and
the Supreme Court has not declared the death penalty unconstitutional under all circumstances. 
Point of error six is overruled.

 The judgment of the trial court is affirmed.

 KELLER, Presiding Judge

Date delivered: January 12, 2005

Do not publish
1. Tex. Pen. Code §19.03(a).
2. Art. 37.071, §2(g). All references to Articles are to the Texas Code of Criminal
Procedure unless otherwise indicated.
3. Article 37.071, §2(h).
4. See Tex. Pen. Code §19.03(a)(2)("the person intentionally commits murder in the
course of . . . committing or attempting to commit . . . aggravated sexual assault").
5. See Tex. Pen. Code §22.021(a)("without that person's consent").
6. Ford, the victim's boyfriend, would later identify the purse as one he had bought for the
victim.
7. Jackson v. Virginia, 443 U.S. 307 (1979).
8. Allen v. State, 108 S.W.3d 281, 284 (Tex. Crim. App. 2003).
9. Butler v. State, 769 S.W.2d 234, 240 (Tex. Crim. App. 1989).
10. 530 U.S. 466 (2000).
11. 536 U.S. 584 (2002).
12. Moore v. State, 969 S.W.2d 4, 13 (Tex. Crim. App. 1998).
13. Threadgill v. State, 146 S.W.2d 654, , slip op. at 39 (Tex. Crim. App. 2004).
14. Ring, 536 U.S. at 597 n. 3 (citing Apprendi, 530 U.S. at 477, n. 3 for the proposition
that the "Fourteenth Amendment 'has not . . . been construed to include the Fifth Amendment
right to "presentment or indictment of a Grand Jury"'").
15. Moore and Threadgill, supra. See also Rayford v. State, 125 S.W.3d 521, 534 (Tex.
Crim. App. 2003)("Apprendi and Ring have no applicability to Article 37.071 in its current
form").
16. Tex. R. Evid. 103(a)(1).
17. 466 U.S. 668 (1984).
18. Johnson v. State, 68 S.W.3d 644, 655 (Tex. Crim. App. 2002).
19. Scheanette v. State, 144 S.W.3d 503, 505 (Tex. Crim. App. 2004).
20. United States v. Quinones, 205 F. Supp.2d 256 (S.D.N.Y.), rev'd, 317 F.3d 49 (2nd Cir.
2002).
21. Scheanette, 144 S.W.3d at 505-506.